UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HALO TECH HOLDINGS, INC.,          :
                                   :
      v.                           :     Civ. No. 3:07-CV-489(AHN)
                                   :
RANDALL COOPER,                    :
            ET AL.                 :

RULING ON DEFENDANTS' PENDING MOTIONS

The plaintiff, Halo Tech Holdings, Inc. ("Halo"), brings
this action against numerous individuals and entities, alleging
that they acted tortiously with respect to Halo's efforts to sell
a former subsidiary, Empagio, Inc.

The amended complaint names eleven defendants, consisting of
former Empagio employees, an investment bank, and venture capital
entities and their officers.  The former Empagio employees, are
Randall Cooper ("Cooper"), Lynn Fraas ("Fraas"), Steven Garrett
("Garrett"), and Steven Payne ("Payne"); the investment bank is
Croft & Bender LLC ("C&B"); and the venture capital entities and
individuals are Primus Venture Partners, Inc., Primus Capital
Fund LP, LLC, Primus Venture Partners V, LLC, Jonathan E. Dick
("Dick"), Phillip C. Molner ("Molner"), and Primus Venture
Partners (collectively "the Primus defendants").

Now pending before the court are the following motions: (1)
the Primus defendants' motion to dismiss the amended complaint
for lack of personal jurisdiction or, in the alternative, for
failure to state a claim [doc. # 76]; C&B's motion to dismiss the
amended complaint for lack of personal jurisdiction or, in the

alternative, for failure to state a claim [doc. # 79]; Cooper's motion to dismiss for lack of jurisdiction, improper venue and failure to state a claim or, in the alternative, transfer [doc. # 78] and motion to transfer to another district [doc. # 84]; Fraas's motion to dismiss for lack of jurisdiction, improper venue and failure to state a claim or, in the alternative, transfer [doc. # 81] and motion to transfer to another district [doc. # 85]; Payne's motion to dismiss for lack of jurisdiction, improper venue and failure to state a claim or, in the alternative, transfer [doc. # 82] and motion to transfer to another district [doc. # 86]; and Garrett's motion to dismiss for lack of jurisdiction, improper venue and failure to state a claim or, in the alternative, transfer [doc. # 83] and motion to transfer to another district [doc. # 87].

FACTS AND PROCEDURAL BACKGROUND

I.  <u>Facts</u>

Taking all of Halo's allegations as true and drawing all reasonable inferences in its favor, the amended complaint alleges the following facts:[1]

Halo, f/k/a, Warp Technologies Holdings, Inc., is a Nevada corporation with its principal place of business in Connecticut.

---

[1]  Here, the court only sets forth the facts in the amended complaint and does not include any facts alleged in the affidavits submitted by the parties on the various jurisdictional issues.  The court, however, will consider those additional facts as necessary in ruling on the jurisdictional issues.

Its principal business is the acquisition, management, and sale of software companies that develop, sell, or license software for commercial application.

In 2006, Halo acquired all of the shares of Empagio, Inc. ("Old Empagio"), a company headquartered in Georgia and with offices in other states, but none in Connecticut. Old Empagio developed and licensed software for use by human resources professionals. Thereafter, Halo combined Old Empagio with two other companies it had acquired and formed a new company, also called Empagio, Inc. ("New Empagio").

Those acquisitions led Halo to take on debt in excess of $20 million. The New York creditor required Halo to make a $500,000 payment on or before February 28, 2007 and another payment of $1 million on or before March 30, 2007. Default on either payment would result in acceleration of the entire $20 million debt.

For management of New Empagio, Halo tapped Cooper, Payne, Garrett, and Fraas, who served in management positions with Old Empagio (collectively "the Cooper Group"). Cooper became CEO of New Empagio and worked and lived in Georgia. Payne and Garrett also worked and lived in Georgia, and Fraas worked and lived in Illinois.

Later in 2006, Halo attempted to sell New Empagio. It anticipated the sale price of the reconstituted company would cover its $20 million debt and yield a profit. The Cooper Group

wanted to purchase New Empagio.  In the fall of 2006, the Cooper Group engaged C&B, a Georgia investment bank, to act as its financial advisor in connection with the purchase.  Soon thereafter, the Cooper Group and C&B engaged the Primus defendants to finance the transaction.

The Cooper Group also took steps to ensure that no other entity would purchase New Empagio.  Unbeknownst to Halo, Cooper Group and C&B told prospective buyers that Cooper had a right of first refusal to purchase New Empagio and that he intended to exercise it, causing prospective buyers to decline to submit bids for the company.  In addition, the Cooper Group told potential buyers that if Halo sold New Empagio to entities or individuals other than the Cooper Group, then some of New Empagio's clients would not renew their licensing agreements with the company. This conduct, Halo alleges, diminished potential buyers' interest in purchasing New Empagio.

The Cooper Group approached Halo about purchasing the New Empagio in January 2007, when C&B, on behalf of the Cooper Group, sent a "Letter of Intent" to purchase New Empagio for $17 million.  The letter is written on C&B's letterhead and states that C&B presented it to Halo "[o]n behalf of Randy Cooper and the senior management team  . . . of Empagio, Inc. . . ."  (Am. Compl. Ex. A. at 1.)  The letter is signed by Cooper, "as the Representative of the [Cooper] Group," and by a representative of

Halo.

The Letter of Intent outlined the Cooper Group's offer to purchase New Empagio. In particular, the letter limited Halo's ability to negotiate with other buyers for six weeks ("the exclusivity period") and provided for a payment penalty to the Cooper Group and the Primus defendants in the event that Halo breached that clause.

Attached to the Letter of Intent was a letter from the Primus defendants addressed to C&B in Georgia, confirming the Primus defendants' interest in providing up to $14 million in financing for the Cooper Group's buyout of New Empagio ("Indication of Interest"). The Indication of Interest is signed, by Molner and Dick, as managing directors of Primus Venture Partners V, L.L.C.

Halo agreed to the terms of the Letter of Intent, including refraining from bargaining with other buyers during the exclusivity period, because of the lack of other potential buyers for New Empagio; because the interest of the Primus defendants in financing the transaction made the sale feasible; and because it was unaware of the extent to which the Cooper Group had dissuaded other buyers.

After the Letter of Intent was signed and the exclusivity period was in effect, Halo alleges that all of the defendants, without Halo's knowledge, took additional steps to force Halo to

sell New Empagio to them at a reduced price.  In particular, Cooper, together with Molner, one of the Primus defendants, ordered New Empagio employees in California not to invoice Burlington Northern, a California customer.  As a result of this conduct, Burlington Northern declined to pay its annual licensing worth $400,000 in January 2007.

Further, Cooper, together with Molner, dissuaded Northeast Utilities, a Connecticut customer, from making a lump sum payment in early 2007 of either $880,000 or $1.4 million, depending on whether it paid for three or five years of licensing fees.  After New Empagio employees sent Northeast Utilities an invoice, Cooper caused the invoice for the lump-sum payment to be retracted. Around this time, Halo alleges that Garrett traveled to Connecticut to meet with Northeast Utilities and dissuaded that customer from paying for licensing fees in a lump sum.  Following Garrett's visit to Connecticut, Northeast Utilities reverted to paying their licensing fees annually.

The conduct aimed at New Empagio customers had two effects, according to Halo.  First, by causing customers to defer payments until after the Cooper Group purchased New Empagio at the end of the exclusivity period, Cooper, Garrett, and Molner were able to reduce the purchase price of New Empagio because the negotiated purchase price included an adjustment for the value of New Empagio's accounts receivable.  Thus, if the deal had been

consummated, the deferred income would have gone to the Cooper Group, not Halo.  Second, because Halo derived the bulk of its cash flow from a weekly "sweep" of excess funds held by its subsidiaries, including New Empagio, the reduction of income to New Empagio also reduced Halo's cash flow.  During the exclusivity period, Halo anticipated that sweeps of its subsidiaries accounts would yield sufficient cash to make the two payments to its creditor, totaling $1.5 million.  By reducing the cash available to be swept from New Empagio's account, these defendants made it more difficult for Halo to make its two payments to its creditor, thereby compelling Halo to accept the Cooper Group's undervalued offer.

In addition to dissuading customers from paying their invoices, all or some of the defendants began to deal directly with Halo's creditor without Halo's knowledge or permission.  As a result, Halo's creditor grew less confident in Halo's financial position, ultimately causing the creditor to accelerate the loan when Halo was unable to make the required payments.

At the end of the exclusivity period, the defendants offered Halo $2.5 million less for New Empagio than the Letter of Intent stated.  Halo rejected this offer and sought other buyers.  As a result of its reduced cash flow from New Empagio, Halo could not make the February 28, 2007 payment of $500,000 to its creditor.

In early March 2007, before its creditor accelerated the

loan payments, Halo entered into a letter agreement with another buyer, Silver Oak, based in Illinois. The agreement proposed that Silver Oak would purchase ninety percent of New Empagio from Halo for $15 million. When Cooper learned that Halo entered into the letter agreement with Silver Oak, Cooper told Halo that "events would promptly transpire which would cause Silver Oak to cease its efforts to purchase New Empagio." (Am. Compl. ¶ 55.) Shortly thereafter, a group of New Empagio employees, including Fraas, Garrett, and Payne, wrote Silver Oak, stating that "[t]he current management team of Empagio is informing you that we will not be participating in the go forward entity under . . . Silver Oak Services Partners." (Am. Compl. Ex. C ("Silver Oak Letter").) Furthermore, Garrett informed Halo that the Cooper Group would not cooperate with the due diligence efforts by Silver Oak. As a result, Silver Oak backed out of further discussions with Halo. Halo then fired Garrett and Cooper, and Fraas and Payne resigned.

Ultimately, under increasing financial pressure from its creditor, Halo sold New Empagio for $16 million in May 2007 to another buyer. Halo alleges that the circumstances of this sale damaged its relationship with its creditor and resulted in increased fees and default.

II. Procedural History

At some point prior to the filing of this suit, the Cooper

Group and other Halo shareholders sued Halo, alleging that Halo failed to register the stock that the Cooper Group and other shareholders received from Halo's purchase of Old Empagio. This lawsuit is pending in the Northern District of Georgia.

Halo commenced this action on March 29, 2007. Thereafter, the defendants filed motions to dismiss, or in the alternative, to transfer the action to the Northern District of Georgia for consolidation with the action already pending there.[2] However, on July 20, 2007, before the court acted on those motions, Halo amended its complaint. The defendants again moved to dismiss the amended complaint, or in the alternative, to transfer. Those motions are now pending before the court.

On August, 20, 2007, Halo filed for Chapter 11 bankruptcy protection in this district. That matter is currently pending before the bankruptcy court.

<u>DISCUSSION</u>

In its amended complaint, Halo alleges three counts: (1) unfair trade practices, in violation of Conn. Gen. Stat. §§ 42-110a <u>et</u> <u>seq.</u> ("CUTPA") against all defendants; (2) breach of fiduciary duty against the Cooper Group; and (3) tortious interference with fiduciary relations against C&B and the Primus

---

[2] The court has considered the arguments in these motions to dismiss the original complaint to the extent they are referenced or otherwise applicable to the motions to dismiss the amended complaint.

defendants.

The defendants make various arguments for dismissal, including lack of personal jurisdiction, improper venue, and failure to state a claim.  In the alternative, the members of the Cooper Group move to transfer this action to the Northern District of Georgia for consolidation with the other pending action.

The court first addresses the defendants' arguments as to personal jurisdiction.

I.    Lack of Personal Jurisdiction

The Cooper Group and C&B move to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.[3]  They argue that they are not citizens of Connecticut, they are not subject to Connecticut's long-arm statutes, and the exercise of jurisdiction by this court over them will violate their due process rights.  Halo, however, argues that the bankruptcy filing, which occurred after this suit commenced, has mooted the defendants' objections to personal jurisdiction under Connecticut's long-arm statutes because the bankruptcy statute provides for nationwide service of process under federal law.  Before addressing the defendants' arguments

_____

[3]  Initially, the Primus defendants also moved to dismiss the amended complaint for lack of personal jurisdiction.  After the bankruptcy filing, however, they withdrew this argument and now only move to dismiss the amended complaint for failure to state a claim upon which relief can be granted.

as to personal jurisdiction under Connecticut law, the court first addresses what effect the post-commencement bankruptcy filing has on personal jurisdiction.

A.   Personal Jurisdiction under Fed. R. Bank. P. 7004(d)

Halo contends that "[a]ny argument that Connecticut long-arm statutes or minimum contacts are controlling or a factor to be considered has been rendered inapposite by the bankruptcy filing."  (Pl.'s Opp'n to Mot. to Dismiss [doc. # 90] at 6.) Halo reasons that subject-matter jurisdiction is now premised – not on diversity of citizenship as it alleged in the amended complaint – but on a federal question, namely, the bankruptcy statute, 28 U.S.C. § 1334(b), which provides a district court with jurisdiction over a state-law suit "related to" a bankruptcy case.  See, e.g., Diamond Mortgage Corp. of Ill. v. Sugar, 913 F.2d 1233, 1243-44 (7th Cir. 1990).  Building on that assertion, Halo reasons that the court may now rely on Fed. R. Bank. P. 7004(d), which provides for nationwide service of process, to exercise personal jurisdiction over the defendants because they are all residents of the United States.

C&B and the Cooper Group argue that the bankruptcy statute does not provide jurisdiction over this action, but even if it did, the court cannot rely on Rule 7004(d) to exercise personal jurisdiction retroactively.  The court agrees.

In an action before a district court, a party can rely on

-11-

Rule 7004(d) for nationwide service of process if: (1) the district court action is "related to" the bankruptcy proceeding under § 1334(b); and (2) the action is an "adversary proceeding," as required by Fed. R. Bank. P. 7001. See, e.g., Diamond Mortgage Corp., 913 F.2d at 1243-44; see Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1237 (3d Cir. 1994) ("[C]ourts have consistently held that Bankruptcy Rule 7004 (nationwide service of process) applies to both core and non-core proceedings, including non-core, "related to" proceedings before federal district courts.").

Even if the court assumes that this action is now "related to" the bankruptcy proceeding and is an "adversary proceeding" to which Rule 7004(d) applies, that rule is ultimately unavailing because Halo commenced the bankruptcy proceeding after filing this action. As an initial matter, the timing of the bankruptcy filing prevents the court from relying on § 1334(b) for "related to" subject-matter jurisdiction because 28 U.S.C. § 1653,[4] which allows the court to correct pleadings post-commencement to cure a jurisdictional defect, cannot be used to retroactively assert a basis for jurisdiction that did not exist at the time of filing. See AmSouth Bank v. Dale, 386 F.3d 763, 779-80 (4th Cir. 2004) (describing cases allowing post-commencement changes in subject-

---

[4] Section 1653 states: "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."

matter jurisdiction pursuant to 28 U.S.C. § 1653, but only where those jurisdictional bases existed at the time of filing); see also Aetna Cas. & Sur. Co. v. Hillman, 796 F.2d 770, 775-76 (5th Cir. 1986).

In addition, even if the court could retroactively base subject-matter jurisdiction on § 1334(b), it is a longstanding principle that the filing of an action marks the point in time in which a court must consider whether personal jurisdiction exists. 6 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1051 (3d ed. 2002); see, e.g., Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570 (2004) (stating, in the context of diversity jurisdiction, that "[i]t has long been the case that the jurisdiction of the court depends upon the state of things at the time the action is brought") (quotation omitted)). There is no dispute that, at the time Halo commenced this action, it had not filed for bankruptcy, and therefore, the court could not have exercised personal jurisdiction over the defendants via Rule 7004(d)'s nationwide service of process provision.

Further, reliance on Rule 7004(d) for retroactive personal jurisdiction would offend the principle that "[j]urisdiction may not be manufactured by the conduct of others." See Chung v. NANA Dev. Corp., 783 F.2d 1124, 1127 (4th Cir. 1986). Here, if personal jurisdiction exists through no other means, Halo would have succeeded in manufacturing jurisdiction post-commencement

through its bankruptcy filing.  The court is not aware of any case law supporting such a principle; nor has Halo raised any. Indeed, another court has rejected the argument that a post-commencement bankruptcy filing supports the exercise of nationwide service of process under Rule 7004(d).  Smith v. Dade Behring Holdings, Inc., Civ. No. 1:05CV86, 2007 WL 152119, at *10-11 (W.D.N.C. Jan. 16, 2007); see, e.g., Blum v. Morgan Guar. Trust Co. of New York, 539 F.2d 1388, 1391 (5th Cir. 1976) (holding that a statute providing for nationwide service of process may not be used to create personal jurisdiction where the circumstances supporting jurisdiction did not exist at the time of filing the action); cf. In re Celotex Corp., 124 F.3d 619 (4th Cir. 1997) (holding that nationwide service of process applied to action filed after the plaintiff filed for bankruptcy).

Finally, the court sees no point in straining to rely on Rule 7004(d) at the very beginning of this case in light of the risk of proceeding through discovery and trial and later being reversed on appeal because it lacks personal jurisdiction.  Thus, the more prudent course is to eschew reliance on Rule 7004(d) and proceed under the view that this action is based on diversity jurisdiction, as alleged in the amended complaint.[5]  (See Am.

---

[5]  Of course, assuming the court lacks personal jurisdiction over C&B and the Cooper Group, Halo may move the court to withdraw this action against the defendants and then file another action based on "related to" subject-matter jurisdiction, thereby relying on Rule 7004(d) for personal jurisdiction.

Compl. [doc. # 63] ¶ 24.)

Accordingly, the court now turns to whether it can exercise personal jurisdiction under any of Connecticut's long-arm statutes or whether dismissal is necessary under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, as C&B and the Cooper Group argue.

### B.    Personal Jurisdiction under Connecticut's Long-Arm Statutes

A federal court sitting in Connecticut in diversity must rely on Connecticut's long-arm statutes in determining whether a sufficient basis exists for exercising personal jurisdiction over the nonresident defendants.  See Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004).  "If jurisdiction is appropriate under the relevant statute, the court must then decide whether the exercise of jurisdiction comports with due process."  Savin v. Ranier, 898 F.2d 304, 306 (2d Cir. 1990).

Where a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction over the nonresident defendant. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).  When a court rules on a motion to dismiss for lack of jurisdiction under Rule 12(b)(2) without an evidentiary hearing, as is the case here, the plaintiff must only present a prima facie case of personal jurisdiction.  DeStephano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).  That prima facie

case can be established by the complaint, affidavits, or exhibits.  Nat'l Tel. Directory Consultants, Inc. v. Bellsouth Adver. & Pub. Corp., 25 F. Supp. 2d 192, 194 (S.D.N.Y. 1998). The court must assume the truth of the plaintiff's factual allegations, id., even in light of defendants' "contrary allegations that place in dispute the factual basis of plaintiff's prima facie case."  Pilates, Inc. v. Pilates Inst., Inc., 891 F. Supp. 175, 178 (S.D.N.Y. 1995).  However, "[v]ague and conclusory allegations in a pleading are insufficient to establish personal jurisdiction."  In re Bayou Hedge Funds Invest. Litig., 472 F. Supp. 2d 534, 538 (S.D.N.Y. 2007).

The court will address each defendant individually, except for the Primus defendants, who have conceded personal jurisdiction.

### 1.   C&B

Halo initially argues that Conn. Gen. Stat. § 33-929(f) supports long-arm jurisdiction over C&B.  First, Halo points to subsection (1) of that statute, which allows a court to exercise personal jurisdiction over a foreign corporation where the cause of action arises "[o]ut of any contract made in this state or to be performed in this state."  Conn. Gen. Stat. § 33-929(f)(1). Halo contends that the Letter of Intent sent to Halo in Connecticut by C&B on behalf of the Cooper Group satisfies subsection (1) because C&B "entered into a contract to be

performed in Connecticut by which [Halo] was obligated to deal exclusively with its own fiduciaries, while they were engaged in duplicitous conduct for their own benefit."  (Pl.'s Opp'n to Mot. to Dismiss [doc. # 64] at 11-12.)

The court cannot rely on the Letter of Intent to exercise long-arm jurisdiction under § 33-929(f)(1) because C&B was not a party to the letter and did not enter into any agreement with Halo.  Although written on C&B letterhead, the letter constituted an agreement between the Cooper Group and Halo.  Indeed, the letter begins by stating that C&B submits it "[o]n behalf of Randy Cooper and the senior management . . . of Empagio, Inc. . . . ." and later explicitly states that C&B "is not a party to the agreement and is not bound by it."  (Am. Compl. [doc. # 63] Ex. A, at 1, 5)  Consistent with these terms, Cooper and Halo executed the letter, not C&B.  (See id. at 6.)  Thus, this action does not arise from any contract to which C&B was a party, and therefore, § 33-929(f)(1) does not support jurisdiction.

Halo also contends that the court may exercise jurisdiction over C&B under subsection (2) of § 33-929(f), which provides for jurisdiction arising "out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state."  Halo reasons that jurisdiction exists under subsection (2) because C&B "solicited"

the purchase and financing of the stock in New Empagio, which Halo holds in Connecticut, and that C&B has repeatedly solicited such business.

Subsection (2), however, cannot support jurisdiction either. Foremost, assuming C&B could solicit New Empagio's stock in Connecticut, the term "solicited" in subsection (2) means solicitation of customers. <u>See</u> <u>BCH Am., Inc. v. DEKO Int'l Co., Ltd.</u>, No. FSTCV064008327S, 2007 WL 448868, at *3 & n.4 (Conn. Super. Jan. 26, 2007). Moreover, the allegations in the amended complaint do not permit any inference that C&B solicited Halo because C&B represented the Cooper Group, the would-be purchasers of New Empagio, while Halo, the owner and seller of New Empagio, was on the opposite side of the proposed transaction.[6] (<u>E.g.</u>, Decl. of Ronald B. Goldman [doc. # 41-2] ¶¶ 5, 6 (stating that C&B's involvement with New Empagio was related to an engagement agreement between C&B and Cooper and that C&B never entered into any agreement to provide services to Halo).)

Halo finally relies on subsections (1), (2), and (3) of §

---

[6] Halo does not specifically argue that jurisdiction exists under § 33-929(f)(4), which provides jurisdiction over a foreign corporation when the claim arises from tortious conduct in Connecticut. (<u>See</u> Am. Compl. [doc. # 63] ¶ 27 & Pl.'s Opp'n to Mot. to Dismiss [doc. # 64] at 13-15). Even if it did, this subsection could not support jurisdiction because Halo does not specifically allege that C&B contacted any potential buyers or New Empagio customers in Connecticut, and therefore, Halo did not suffer "direct economic injury" in this state. <u>See</u> <u>Lechner v. Capital Group Co.</u>, No. 3:05CV1410 (WWE), 2006 WL 1525967, at *2 (D. Conn. May 26, 2006).

52-59b, which provide for jurisdiction over a "foreign partnership or foreign voluntary association" under certain circumstances. Conn. Gen. Stat. § 52-59b(a). Halo argues that § 52-59b applies to a limited liability company, like C&B. Cf. Nadler v. Grayson Constr. Co., Inc., No. CV020190015S, 2003 WL 1963158, at *5 (Conn. Super. Apr. 15, 2003) (applying § 52-59b to a foreign limited liability company). However, "the weight of Connecticut authority . . . holds that § 33-929(f) is the long-arm statute applicable to [foreign] limited liability corporations."[7] Bayou Hedge Funds, 472 F. Supp. 2d at 537 (citing cases); see Lechner v. Ustjanauskas, No. CV075008306, 2007 WL 2835548, at *6 (Conn. Super. Sept. 19, 2007) ("The legislature certainly knows the differences in business entities when passing statutes concerning venue or the assertion of long arm jurisdiction.") (internal quotation omitted). As Bayou Hedge Funds notes, the Connecticut "cases hold that a limited liability corporation is to be treated like any other corporation for long-arm purposes." The court agrees with the weight of authority and finds that § 52-59b(a) does not apply to foreign limited liability companies, like C&B.

---

[7] The parties do not argue that any difference exists under this statute between a "limited liability company" and a "limited liability corporation." See Hartford Fire Ins. Co. v. United Restoration LLC, No. CV020813517, 2003 WL 1962864, at *3 (Conn. Super. Apr. 4, 2003) (treating these entities as the same for purposes of § 33-929(f)).

For these reasons, the court finds that the amended complaint does not make a prima facie showing that this court can exercise personal jurisdiction over C&B under these Connecticut long-arm statutes. The court, therefore, will not consider whether such jurisdiction would comport with due process. Accordingly, the court grants C&B's motion to dismiss pursuant to Rule 12(b)(2).

### 2. Fraas

In support of long-arm jurisdiction over Fraas, Halo relies on subsections (1) and (3) of Conn. Gen. Stat. § 52-59b(a), which allow the court to exercise jurisdiction over a nonresident individual who, in person or through an agent:

> (1) transacts any business within the state; . . . or (3) commits a tortious act outside the state causing injury to person or property within the state . . . if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . ."

Conn. Gen. Stat. § 52-59b(a). Halo argues that Fraas transacted business in Connecticut when she entered into the Letter of Intent with Halo and that Fraas committed out-of-state tortious conduct by working with the Cooper Group to dissuade potential buyers from bidding on New Empagio and New Empagio customers from

paying invoices during the exclusivity period.

The inquiry under subsection (1) centers on whether Fraas transacted business by entering into the Letter of Intent. The test for determining whether a defendant has transacted business in Connecticut involves a variety of factors, including, among other things: (1) whether the defendant entered into an ongoing contractual relationship with a Connecticut-based plaintiff; (2) whether the contract was negotiated in Connecticut; (3) whether, after executing a contract with the defendant, the defendant visited Connecticut to meet with the plaintiff or communicated with the plaintiff as part of the contractual relationship; (4) and whether the contract contains a Connecticut choice-of-law provision. See Finnimore v. Jobel, No. CV075002925S, 2007 WL 2390818, at *2 (Conn. Super. Aug. 10, 2007); see also Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996). No single factor is dispositive and other factors may also be considered. Indeed, jurisdiction can arise from "a single purposeful business transaction." Zartolas v. Nisenfeld, 184 Conn. 471, 474 (1981). "[C]ourts generally do not apply a rigid formula but balance considerations of public policy, common sense, and the chronology and geography of the relevant factors." Vertrue Inc. v. Meshkin, 429 F. Supp. 2d 479, 490 (D. Conn. 2006) (internal quotation omitted). The inquiry focuses on "the nature and quality" of the contacts with Connecticut "in connection with

the matter in suit," rather than the number of Connecticut contacts.  Id.

Here, the nature and quality of Fraas's contacts with Connecticut do not amount to transacting business in Connecticut within the meaning of the long-arm statute.  The Letter of Intent pertained to the sale of stock in an out-of-state business, i.e., a Delaware corporation headquartered in Georgia.[8]  (Fraas Aff. [doc. # 81-3]  ¶ 7; Garrett Aff. [doc. # 83-3] ¶ 8.)  Moreover, the letter provided that it would be governed by Georgia law, and thus, it cannot be said that Fraas, an Illinois resident, availed herself of Connecticut law in connection with the sale of New Empagio.  Further, Fraas never saw the Letter of Intent and never communicated with Halo regarding it.  (See Fraas Decl. [doc. # 81-3] ¶ 24.)

Indeed, the only link between the Letter of Intent and Connecticut is the fact that it was sent by C&B to Halo in Connecticut.  Even assuming that C&B or Cooper acted as Fraas's agent in sending the letter to Connecticut, that fact alone would

_____

[8]  While Halo claims that New Empagio shares were located in Connecticut, New Empagio was a Delaware corporation, and therefore, not located in Connecticut for jurisdictional purposes.  See Baker v. Gotz, 387 F. Supp. 1381, 1391 (D. Del. 1975) (stating that under 8 Del. C. § 169, the situs of stock of a Delaware corporation is in Delaware for purposes of jurisdiction or attachment); Fletcher Cyclopedia of the Law of Corporations §§ 5101, 4760.10 (2007) (noting that "Delaware . . . is an exception" to the "general rule" that "[w]here location counts, courts today generally look to the location of the share certificates rather than the corporate domicile").

be insufficient to constitute "transacting business" in Connecticut.  "The transmission of communications between an out-of-state defendant and a [party] in the jurisdiction does not, by itself, constitute the transaction of business within the forum state." Bross Util. Serv. Corp. v. Aboubshait, 489 F. Supp. 1366, 1371-72 (D. Conn. 1980) (internal quotations omitted); see, e.g., Coan v. Bell Atl. Sys. Leasing Int'l, Inc., 813 F. Supp. 929, 946 (D. Conn. 1990) (finding that a nonresident's transmission of a draft tax opinion to a Connecticut corporation is insufficient to confer jurisdiction under § 52-59(a)(1)).  Considering the absence of other jurisdictional contacts with Connecticut in connection with the Letter of Intent, the mere transmission of the letter to Connecticut is insufficient to support jurisdiction under 52-59b(a)(1).[9]

There is also no factual or legal merit to Halo's argument that § 52-59b(a)(3) confers long-arm jurisdiction over Fraas based on her alleged out-of-state tortious conduct, which caused injury to Halo in Connecticut  As a factual matter, the only

_____

[9]  While Halo argues that the Letter required it to perform its contractual obligations in Connecticut by abstaining from negotiating with other potential buyers of New Empagio during the exclusivity period, Halo's argument misses the mark.  The inquiry focuses on Fraas's conduct, not Halo's.  Indeed, Halo provides no authority for the proposition that an out-of-state individual, as opposed to a corporation, transacted business in Connecticut within the meaning of 52-59b(a)(1).

specific allegation of Fraas' individual, as opposed to collective, conduct involves the Silver Oak Letter, which she and other members of New Empagio management sent to Silver Oak in Illinois, advising that they would not work for New Empagio or any related entity if Silver Oak purchased the company.

As a legal matter, this conduct fails to sustain jurisdiction under subsection (3) because that out-of-state tortious conduct did not cause direct economic injury to Halo in Connecticut within the meaning of the long-arm statute.  See Greene v. Sha-Na-Na, 637 F. Supp. 591, 597 (D. Conn. 1986) (noting that "the determinative factor is evidence of direct economic injury to the plaintiff within the state") (citing Conn. Artcraft Corp. v. Smith, 574 F. Supp. 626, 629-30 (D. Conn. 1983)).  The mere fact that a plaintiff that is domiciled or incorporated in Connecticut loses profits or suffers some other pecuniary injury does not necessarily mean it suffered direct economic injury in Connecticut.  "Rather, in the context of commercial torts, the place of injury is generally the place where the critical events associated with the dispute took place."  Bross Util. Serv. Corp., 489 F. Supp. at 1374 (construing § 52-59b(a)(3) in light of nearly identical provisions of New York's long-arm statute) (internal quotation omitted)).  Here, because the critical events associated with the alleged out-of-state tortious conduct took place either in

Illinois, where Silver Oak was located, or in Georgia, where the Silver Oak Letter may have been mailed, it cannot be said that Halo suffered direct economic injury in Connecticut.

The conclusion that Fraas's out-of-state tortious conduct is not sufficient to confer long-arm jurisdiction would not be different, even if the court attributed to her the collective conduct of the Cooper Group, of which she was a member. That collective conduct consisted of undermining Halo's efforts to sell New Empagio by dissuading potential buyers and cutting off Halo's cash flow. (See, e.g., Am. Compl. [doc. # 63] ¶¶ 37-38, 45.) However, because the allegations relating to this conduct are too vague as to where they occurred, they cannot be considered in determining whether they caused Halo direct economic injury in Connecticut.

Accordingly, because there is insufficient evidence that Fraas's alleged out-of-state tortious conduct, both individually and collectively, caused direct economic injury to Halo in Connecticut, the court does not have any long-arm jurisdiction over Fraas under § 52-59b(a)(3).

In the absence of any basis to exercise long-arm jurisdiction over Fraas under § 52-59b(a), there is no need for the court to consider whether the exercise of long-arm jurisdiction would comply with the requirements of due process. Accordingly, Fraas's motion to dismiss under Rule 12(b)(2) is

granted.

### 3. <u>Payne</u>

Halo makes many of the same arguments in support of long-arm jurisdiction over Payne as it did for Fraas. In particular, Halo argues that § 52-59b(a)(1) supports jurisdiction over Payne based on the Letter of Intent and § 52-59b(a)(3) supports jurisdiction based on Payne's out-of-state tortious conduct. As to the latter, Halo points to the Silver Oak Letter and the general allegations of tortious conduct by the Cooper Group, of which Payne was a member. The court, however, has already rejected these arguments as a basis for jurisdiction. Accordingly, the court finds that neither the Letter of Intent nor Payne's out-of-state tortious conduct support long-arm jurisdiction under § 52-59b(a).

In addition, however, Halo contends that Payne is subject to long-arm jurisdiction under § 52-59b(a)(1) because of Payne's employment agreement with Halo and that this action arises from Payne's breach of fiduciary duties related to his employment. Even assuming that this was sufficient to constitute a business transaction within the meaning of subsection (1) and thus support jurisdiction over Payne under the long-arm statute, the exercise of such jurisdiction would not comport with due process.

The exercise of long-arm jurisdiction complies with due process only if it would be reasonable under the circumstances of

the particular case and if the defendant has "minimum contacts" with the forum state. See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002). Where "the claim arises out of, or relates to, the defendant's contacts with the forum," "minimum contacts" are established if the defendant "purposely avails himself of the privileges and benefits" of the forum state. Id. The purposeful availment requirement protects defendants from being haled into court based on "random, fortuitous or attenuated contacts," Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985), and assures that they have "fair warning" that their conduct could subject them to suit in the forum state. See Bensmiller v. E.I. DuPont de Nemours & Co., 47 F.3d 79, 85 (2d Cir. 1995). Ultimately, this inquiry determines whether the court's exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

The allegations in the amended complaint indicate that Payne did not purposefully avail himself of the privileges and benefits of Connecticut such that he could reasonably anticipate being haled into court here. Halo does not dispute that throughout Payne's employment with Halo and New Empagio, he worked from an office located in Georgia, did not travel to Connecticut for any business related to Halo or New Empagio, and did not communicate

with anyone in Connecticut for business relating to Halo or New Empagio.  (Aff. of Payne [doc. # 82-2] ¶¶ 17, 18.)  Moreover, he received paychecks drawn on a New Empagio bank account in California and his employment agreement with Halo was governed by New York law.  (Id. ¶ 19; Ex. A, at 14.7.)  Further, none of the allegations indicate that Payne's tortious conduct took place in Connecticut.  See, e.g., Dictaphone Corp. V. Gagnier, No. 3:05CV266 (CFD), 2006 WL 726675, at *4 (D. Conn. March 22, 2006) (finding long-arm jurisdiction over a nonresident defendant under § 52-59b(a)(1) based on an employment agreement with a Connecticut employer, but finding the assertion of personal jurisdiction would violate due process because none of the allegations of defendant's misconduct took place in Connecticut).

The fact that Payne may have received benefits administered by Halo in Connecticut, including a corporate credit card, insurance, and a 401K, (see Decl. of Susan Florentino [doc. # 64-5] ¶ 2), does not make the exercise of jurisdiction appropriate because these contacts are too attenuated to support a finding that Payne purposefully availed himself of the benefits and privileges of Connecticut to satisfy due process.  See, e.g., Savin, 898 F.2d at 306 (holding that the exercise of personal jurisdiction did not comply with due process where defendant's contact with forum state consisted of designating Connecticut as place of payment on promissory note).

Therefore, even if Payne's employment agreement supports the exercise of long-arm jurisdiction under § 52-59b(a)(1), the exercise of personal jurisdiction would not comport with the requirements of due process.  Accordingly, Payne's motion to dismiss under Rule 12(b)(2) is granted.

### 4.  <u>Garrett</u>

As with Fraas and Payne, Halo relies on § 52-59b(a) in support of long-arm jurisdiction over Garrett.  In particular, Halo alleges that Garrett committed tortious acts either in-state or committed tortious acts out-of-state, causing direct economic injury to Halo in Connecticut.  Garrett argues that Halo has not alleged that he committed any tortious acts in Connecticut.  He further argues that, to the extent Halo's allegations involved out-of-state tortious conduct, such allegations are insufficient to support long-arm jurisdiction because Halo suffered no direct economic injury in Connecticut.

The court, however, finds that Halo has made a prima facie showing of long-arm jurisdiction over Garrett under § 52-59b(a)(2), based on Halo's allegation that he traveled to Connecticut to visit Northeast Utilities for the purpose of convincing them to not pay for licensing fees in a lump sum, thereby reducing Halo's cash flow and forcing them into a precarious financial position during the exclusivity period. (<u>See</u> Am. Compl. [doc. # 63] ¶ 52.c.)  While Garrett denies this

allegation, (see Garrett Aff. [doc. 83-3] ¶ 17), the court must credit Halo's allegation at this stage of the proceeding. Pilates, Inc., 891 F. Supp. at 178.

Garrett argues that, even if the court has long-arm jurisdiction, the exercise of such jurisdiction would not comport with due process. The court disagrees. Due process requires that the defendant has minimum contacts with the forum state and that the exercise of long-arm jurisdiction be reasonable. Bank Brussels Lambert, 305 F.3d at 127. Here, the minimum contacts requirement is satisfied because specific jurisdiction exists, that is, "the suit arises from the defendant's contacts with the forum. . . ." Broadcast Marketing, 345 F. Supp. 2d at 1060 n.7. Crediting Halo's allegations that Garrett visited Connecticut to dissuade a New Empagio customer from paying its licensing fees to New Empagio in a lump sum, it is clear that Garrett "purposefully avail[ed]" himself of the privileges and benefits of Connecticut such that he could reasonably anticipate being haled into a Connecticut court in connection with that activity. See Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Moreover, the second requirement, reasonableness, is also met. The "reasonableness" analysis considers:

> 1) the burden that the exercise of
> jurisdiction will impose on the defendant; 2)
> the interests of the forum state in
> adjudicating the case; 3) the plaintiff's
> interest in obtaining convenient and effective
> relief; 4) the interstate judicial system's

> interest in obtaining the most efficient
> resolution of the controversy; and 5) the
> shared interest of the states in furthering
> substantive social policies.

Metro. Life Ins. Co., 84 F.3d at 568 (citing Asahi Metal Indus.

Co. v. Super. Ct. Cal., 480 U.S. 102, 113-14 (1987)).

These factors, on balance, favor Halo. As to the second

factor, Connecticut has an interest in adjudicating this case

because Halo's principle place of business is located here, and

therefore, Connecticut has an interest in providing a forum to

redress alleged wrongs suffered by corporations operating within

its borders. As to the third factor, Halo, being located here,

clearly has an interest in obtaining convenient and effective

relief in this state. The fourth factor, efficient resolution of

the case, generally depends on the location of witnesses and

evidence. See Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 245

(2d Cir. 1999). While some witnesses and documents are

presumably located in Georgia, where Garrett resides, other

witnesses are presumably located in California, Illinois, and

Connecticut, including third-party witnesses at Northeast

Utilities. As to the first factor, while the exercise of

jurisdiction will inconvenience Garrett somewhat, this distance

and travel logistics are not so great as to justify dismissal.

Moreover, if the case was brought in Georgia, other witnesses,

including third party witnesses, would be inconvenienced to the

same extent. The fifth factor is not implicated here.

Accordingly, Garrett's motion to dismiss for lack of personal jurisdiction is denied.

### 5. Cooper

Halo argues that Cooper is amenable to long-arm jurisdiction under § 52-59b(a)(1), based on his employment contract with Halo, and subsection (3), based on his out-of-state tortious conduct. The court finds that Halo's allegations make a prima facie showing, satisfying both of these long-arm statutes, and that the exercise of long-arm jurisdiction in this instance comports with due process.

Section 52-59b(a)(1) supports jurisdiction over Cooper because he entered into an employment agreement with Connecticut-based Halo and this suit arises from that agreement. Connecticut courts applying subsection (1) have found that employees who negotiate employment contracts with Connecticut-based companies may be haled into court in Connecticut in suits arising from that employment relationship. E.g., Meta Group, Inc. v. IDC Research, Inc., No. (X10) NNHCV054016768S (CLD), 2006 WL 1230532, at *3 (Conn. Super. Apr. 20, 2006) (finding that two employees had transacted business where the employees negotiated their respective employment contracts in Connecticut and corresponded with a Connecticut office about their continued employment, their performance, and other human resource issues). While Cooper claims that he was employed by New Empagio, his employment

agreement clearly states that it is an agreement between him and Halo. While he was charged with operating Halo's subsidiary, he ultimately answered to Halo in Connecticut. Indeed, he admits traveling to Connecticut to meet with Halo for, among other things, a two-day CEO development camp. Moreover, reliance on his employment agreement is proper in this case because Halo's claim that he breached his fiduciary duties toward Halo necessarily arises from his employment. See Dictaphone Corp., 2006 WL 726675, at *4.

Section 52-59b(a)(3) also supports long-arm jurisdiction over Cooper based on his alleged conduct toward Northeast Utilities. Specifically, Halo alleges that Cooper dissuaded this Connecticut-based customer of New Empagio from paying its invoice, resulting in decreased cash flow up to $1.4 million to Halo during the exclusivity period. (Am. Compl. [doc. # 63] ¶ 52.b.; Decl. of Richard Bigelow [doc. # 64-3] ¶¶ 7-10.) Therefore, subsection (3)'s requirement that Halo suffer "direct economic injury . . . within the state," see Bross Util. Serv. Corp., 489 F. Supp. at 1374, is satisfied by this allegation. While Cooper denies any wrongdoing toward Northeast Utilities, (see Cooper Aff. [doc. # 78-3] ¶ 31), the court must credit Halo's allegations at this stage.

Cooper argues that subsection (3) cannot support jurisdiction because none of Halo's allegations satisfy either of

that subsection's additional requirements, that is, he:

> (A) regularly does or solicits business,
> or engages in any other persistent course
> of conduct, or derives substantial
> revenue from goods used or consumed or
> services rendered, in the state, or (B)
> expects or should reasonably expect the
> act to have consequences in the state and
> derives substantial revenue from
> interstate or international commerce.

Conn. Gen. Stat. § 52-59b(a). Halo, however, has made a prima facie showing that Cooper regularly does or solicits business in Connecticut by virtue of his employment contract with Halo and his calls and emails to Connecticut for business purposes. As discussed above, Cooper entered into an employment contract with Halo. While he argues that his paycheck was drawn on a California bank, he admits traveling to Connecticut at least three times on business related to Halo or New Empagio, "occasionally" participating in a phone call to an "individual" in Connecticut, and emailing individuals in Connecticut regarding New Empagio business. (Cooper Aff. [doc. # 78-3] ¶¶ 24-26.) While those admissions are vague and carefully crafted, (see id. ¶¶ 31-32), the court finds that Halo has made a sufficient showing for this stage of the proceeding. Cf., e.g., MemberWorks, Inc. v. Heartland Direct, Inc., No. CV030197372, 2004 WL 2397322, at *4 (Conn. Super. Sept. 27, 2004) (finding that the defendants's "long-term business relationship with MemberWorks, including regular communications, frequent telephone

calls, and multiple visits to Connecticut, satisfy the requirement that Rey regularly did business in Connecticut").

The exercise of long-arm jurisdiction over Cooper also comports with due process. The minimum contacts analysis is satisfied because this suit arises out of Cooper's Connecticut contacts. By entering into an employment contract with Connecticut-based Halo and then allegedly causing a Connecticut-based customer of Halo's subsidiary to not pay an invoice, Cooper purposefully availed himself of the privileges and benefits of Connecticut such that he could reasonably expect to be haled into court here. The reasonableness analysis is also satisfied for the same reasons the court gave with respect to Garrett.

Accordingly, the court denies Cooper's motion to dismiss for lack of personal jurisdiction.

II. <u>Venue</u>

Cooper and Garrett also argue that venue is improper under 28 U.S.C. § 1391(a) and move to dismiss pursuant to Fed. R. Civ. P. 12(b)(3).

Section 1391(a) provides:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. . . .

28 U.S.C. § 1391(a).

The court need not choose the best venue, see Bates v. C & S Adjusters, Inc., 980 F.2d 865, 867 (2d Cir. 1992); rather, it need only decide whether plaintiff has alleged facts showing that a substantial part of the underlying events took place in this district. See Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 357 (2d Cir. 2005) ("[S]ignificant events or omissions material to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere."). "'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 432-33 (2d Cir. 2005).

While some tortious conduct allegedly occurred outside of Connecticut, a significant event occurred in Connecticut – the conduct toward Northeast Utilities.  As discussed, the alleged tortious conduct by Cooper and Garrett toward this New Empagio customer contributed to Halo's inability to make its loan payments during the exclusivity period, resulting in Halo's alleged losses and ultimate bankruptcy.  This is sufficient for proper venue to lie in this district.

III. Transfer

In the alternative, Cooper and Garrett move to transfer this

action to the Northern District of Georgia.  They first argue
that this transfer is warranted because the "first filed" rule
compels the court to transfer this action for consolidation with
the other action pending there.  The two actions, according to
Cooper and Garrett, are "inextricably intertwined" and a transfer
would serve judicial economy.

"Where two courts have concurrent jurisdiction over an
action involving the same parties and issues, courts will follow
a 'first filed' rule whereby the court which first has possession
of the action decides it."  800-Flowers, Inc. v. Intercontinental
Florist, Inc., 860 F. Supp. 128, 131 (S.D.N.Y. 1994) (citation
omitted).  This "rule embodies considerations of judicial
administration and conservation of resources."  First City Nat'l
Bank & Trust Co. v. Simmons, 878 F.2d 76, 80 (2d Cir. 1989).

The first filed rule, however, has no application here
because the issues involved in the two lawsuits are unrelated.
In the Georgia suit, Cooper, Garrett, and a number of other Halo
shareholders claim that Halo failed to register their shares,
which they received when Halo acquired Old Empagio.  (Cooper Aff.
Ex. E.)  In that action, the plaintiffs allege that Halo breached
its contract with the shareholders and committed fraud.  In this
action, the shares that Cooper and Garrett received as part of
Halo's acquisition of Old Empagio and the claims arising out of
Halo's alleged failure to register those shares are little more

than backstory. As discussed already, Halo alleges that Cooper and Garrett breached their fiduciary duties and engaged in unfair trade and business practices related to the sale of New Empagio, a wholly different corporation, albeit with the same legal name. Given that these two lawsuits involve different factual issues and claims, the court finds Cooper and Garrett have not demonstrated that a transfer to the Northern District of Georgia would further judicial economy. See, e.g., Pitney Bowes Inc. v. Ricoh Corp., No. 3:03CV1985 (RNC), 2004 WL 243351, at *1 (D. Conn. Feb. 7, 2004) (finding the first filed rule inapplicable where one suit alleged infringement of patents through the manufacture of postage metering machines and the other alleged infringement of a patent through the manufacture of multi-function printers). Accordingly, the motion to transfer based on the first filed rule is denied.

Cooper and Garrett also move to transfer this action to the Northern District of Georgia pursuant to 28 U.S.C. § 1404. They allege that such a transfer is necessary for the convenience of the parties and the witnesses and in the interests of justice.

In deciding a motion to transfer, the court considers, among other things:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the

attendance of unwilling witnesses, [and] (7)
                    the relative means of the parties.

Albert Fadem Trust v. Duke Energy Corp., 214 F. Supp. 2d 341, 343

(S.D.N.Y. 2002).  District courts have broad discretion in making

determinations of convenience under Section 1404(a) and notions

of convenience and fairness are considered on a case-by-case

basis.  In re Cuyahoga Equip. Corp., 980 F.2d 110, 117 (2d Cir.

1992).  The defendants have the burden of presenting "a strong

case for transfer."  Argent Funds Group, LLC v. Schutt, No.

3:05cv01456 (SRU), 2006 WL 2349464, at *3 (D. Conn. 2006).  In

addition, "a court does not seek merely to transfer inconvenience

from one party to the other."  Van Ommeren Bulk Shipping, B.V. v.

Tagship, Inc., 821 F. Supp. 848, 850 (D. Conn. 1993).

       Under these factors, Cooper and Garrett have not

demonstrated that, on balance, these factors tip strongly in

favor of transfer to the Northern District of Georgia.[10]  The

first factor obviously weighs in Halo's favor.  Its choice of

forum "is presumptively entitled to substantial deference," and

"unless the balance is strongly in favor of the defendant, . . .

should rarely be disturbed."  Gross v. BBC, 386 F.3d 224, 230 (2d

Cir. 2004) (internal citations omitted).

       The second and third factors do not favor either party, as

_____

       [10]  A primary focus of the transfer argument by Cooper and
Garrett is the fact the case is pending before the Northern
District of Georgia, but the court has already found that this
prior-pending case does not warrant a transfer.

far as the court can tell at this stage.  While the defendants, their records, and their witnesses appear to be located in Georgia and Illinois, the court cannot say what these records are or who these witnesses will be because Cooper and Garrett advance generalized arguments that provide the court with little understanding of the potential logistical inconvenience caused by trial in this venue.  (See, e.g., Cooper Aff. [doc. # 78-3] ¶ 38 (stating in "the material documents are likely located in the State of Georgia as are New Empagio's key former employees") (emphasis added).)  As far as the court can tell, some potential witnesses and documents will lie in Georgia, but they also lie in Illinois, California, and Connecticut, as well as other places not yet known to Halo until after discovery.  Thus, the court cannot say that the defendants have demonstrated that factors two or three weigh in their favor.

The fourth factor, convenience of the parties, favors neither party because, this being a diversity action, one party must travel.  As to the fifth factor, some of the operative facts underlying Halo's claims arise from alleged conduct in Connecticut, as well as other places besides Georgia.  As to the sixth factor, Cooper and Garrett have not demonstrated that there are out-of-state witnesses unwilling to testify here.  Indeed, they fail to even provide the court with a list of non-party witnesses.  Moreover, non-party witnesses from Northeast

Utilities are presumably located in this district.  While the
seventh factor – the relative means of the parties – weighs in
the favor of Cooper and Garrett, they have not shown that their
resources are so lacking that they would be disadvantaged by
litigating in Connecticut.

Thus, Cooper and Garrett have failed to meet their "heavy
burden" that transfer is necessary for convenience of the parties
and in the interest of justice.  Accordingly, their motions to
transfer are denied.

IV.  <u>Failure to state a claim</u>

The Primus defendants, who no longer challenge personal
jurisdiction and venue, move to dismiss the CUTPA and aiding and
abetting breach of fiduciary duty claims pursuant to Rule
12(b)(6).

In deciding a Rule 12(b)(6) motion to dismiss, the court
must take all factual allegations in the complaint and its
exhibits as true, and construe all reasonable inferences in the
plaintiffs' favor.  <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147,
152 (2d Cir. 2002).  The appropriate inquiry is not whether the
plaintiff is likely to prevail, but whether she is entitled to
offer evidence to support her claims.  <u>Nechis v. Oxford Health
Plans, Inc.</u>, 421 F.3d 96, 100 (2d Cir. 2005).  Nevertheless, Rule
12(b)(6) "obliges a pleader to amplify a claim with some factual
allegations in those contexts where such amplification is needed

to render a claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (citing Bell Atlantic Corp. v. Twombly, ---U.S. ----, 127 S.Ct. 1955 (2007)).  In ruling on a motion to dismiss, the court may not consider matters outside the complaint, but may consider documents attached to the complaint, referenced in the complaint, or integral to the complaint. Chambers, 282 F.3d at 152-53.

A.   CUTPA (Count 1)[11]

The Primus defendants rely on Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172 (1986), to argue that dismissal is appropriate because CUTPA does not apply to the proposed stock sale alleged here.[12]  Halo responds that this case is distinguishable from the situation in Russell.  The court agrees.

CUTPA provides relief for unfair or deceptive acts or practices occurring in "trade or commerce," which is defined as "the advertising, the sale . . ., the offering for sale . . ., or the distribution of any service and any property, tangible or

---

[11]  Cooper and Garrett also move to dismiss Halo's CUTPA claim for failure to state a claim by joining the Primus defendants arguments.  For the reasons given herein, the court denies those motions.

[12]  The amended complaint alleges that the Primus defendants: (1) aided and abetted the Cooper Group "by continuing to furnish investment banking advice and financial backing after they learned that the Cooper Group was engaging in fiduciary misconduct;" and (2) "directly participated in cutting off the cash flow to Halo and waiting until the very end of the exclusivity [period] to reduce their offer when they felt Halo was in no position to refuse."  (Am. Compl. [doc. # 63] ¶ 63.)

intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."  Conn. Gen. Stat. §§ 42-110b(a) & 42-110a(4).  In Russell, the Connecticut Supreme Court considered whether "trade or commerce" included claims arising in the course of a transaction to buy and sell registered stock.  That case arose where an investor brought a CUTPA claim against both a brokerage firm and an individual broker after the securities the investor purchased lost value.  The court ultimately "conclude[d] that CUTPA does not apply to deceptive practices in the purchase or sale of securities."  Id. at 180-82.

Relying on Russell, the Primus defendants reason that Halo's CUTPA claim arises from the purchase and sale of New Empagio stock, (see Am. Compl. [doc. # 63] ¶ 25(c)), and argue that Halo's claim is, thus, not actionable under CUTPA.  See Gilman v. Gilman, No. 50 87 36, 1990 WL 283219, at *5 (Conn. Super. Aug. 29, 1990) (citing Russell and dismissing shareholder claims against a director and corporation because "CUTPA does not apply to" allegations involving a director's purchase of corporate stock).

However, a careful reading of Russell and subsequent opinions by the Connecticut Supreme Court make clear that Russell's holding does not extend as broadly as the Primus defendants argue.  Russell relied in large part on whether an alternative regulatory scheme governed the sale of securities and

ultimately "determined that the existence and scope of a comprehensive regulatory regime under both federal and state law precluded application of CUTPA to securities transactions." Normand Josef Enter., Inc. v. Conn. Nat. Bank, 230 Conn. 486, 517 (1994) (discussing Russell).  Indeed, in examining whether the FTC had sought to regulate securities transactions, the Connecticut Supreme Court stated that "[t]he FTC has never undertaken to adjudicate deceptive conduct in the sale and purchase of securities, presumably because such transactions fall under the comprehensive regulatory umbrella of the Securities and Exchange Commission." Russell, 200 Conn. at 172.  For these reasons, the Connecticut Supreme Court has described Russell as recognizing an "implied exemption of the securities industry" from CUTPA liability.[13]

Thus, Russell does not prohibit Halo's claim for unfair trade practices in the sale of New Empagio because the defendants are not part of the securities industry and because – as Halo contends and the Primus defendants do not dispute – the stock of

_____

[13]  Later holdings by the Connecticut Supreme Court indicate that the Russell court, in reaching its decision, considered: "(1) the applicability of Federal Trade Commission rules to the suspect conduct and the absence of any Federal Trade Commission regulatory activity over industry practices; (2) the existence and scope of an alternate comprehensive regulatory scheme or system; (3) the absence of any activity by the commissioner of consumer protection within this area; and (4) the case law of other jurisdictions." Normand Josef Enter., Inc., 230 Conn. at 512.

New Empagio was not governed by any regulatory scheme. <u>Cf.</u> <u>Conn.</u>
<u>Nat'l Bank v. Giacomi</u>, 233 Conn. 304, 331 n.29 (1995) (suggesting
that where Connecticut Uniform Securities Act did not provide for
liability for aiding and abetting fraud in the execution of
promissory notes, a litigant could bring a claim based on CUTPA).
Put another way, this case is about the Primus defendants' unfair
and deceptive practices in the sale of a business, conduct to
which CUTPA sqaurely applies. <u>See, e.g.</u>, <u>Neato, L.L.C. v.</u>
<u>Soundview Partners</u>, No. CV010450989, 2002 WL 1455799, at *1
(Conn. Super. May 30, 2002) (finding that CUTPA applied to the
sale of a business).

Other Connecticut courts have reached the same conclusion.
For example, in <u>Tie/Communications v. Kopp</u>, No. 64983, 1992 WL
209854, at *2 (Conn. Super. Aug. 17, 1992), the court declined to
find that <u>Russell</u> prohibited recovery under CUTPA in the context
of a business sale. There, a defendant brought a counterclaim
under CUTPA, alleging that the plaintiff made fraudulent
misrepresentations about "100% of the stock" of a business owned
by the plaintiff. <u>Id.</u> at *1. The plaintiff moved to dismiss the
CUTPA claim based on <u>Russell</u>'s holding that "CUTPA does not apply
to deceptive practices in the purchase and sale of securities."
<u>Id.</u> at *2 (quoting <u>Russell</u>, 200 Conn. at 180). However, the
court held that "although CUTPA does not apply to the sale of
securities pursuant to the holding of the <u>Russell</u> court, the

reasoning of <u>Russell</u> does not apply to a cause of action which alleges unfair trade practices in connection with the sale of an interest in a business where the transfer of stock is simply the means utilized to effectuate the sale." <u>Id.</u> (citing <u>Barraco v. Ethan Allan, Inc.</u>, No. CV 9008-1801, 1992 WL 66401, at *2 (Conn. Super. Feb. 6, 1992) and <u>Capuano v. Frasca</u>, 4 CSCR 568, 568-69 (June 19, 1989)); 12 Robert M. Langer, et al., Conn. Practice § 3.16 (Nov. 2007) (recognizing that "[s]everal cases have reached the conclusion that a sale of an interest in a business that happens to be brought about by a transfer of stock is covered by CUTPA – that is, that it falls within a "transfer of business" exception to <u>Russell</u>.)  As the court later stated in ruling on the motion for summary judgment, "the use of a stock sale simply as the means for effecting the transfer of the corporation should not remove it from the purview of CUTPA, when CUTPA would clearly apply if a sale of assets occurred instead." <u>TIE/Commc'n, Inc. v. Kopp</u>, No. 64983, 1993 WL 515680, at *8 (Conn. Super. Nov. 29, 1993).

Like <u>TIE/Communications</u>, Halo alleges that the Primus defendants employed unfair practices during the purchase of New Empagio.  The means of the sale of New Empagio are incidental to these allegations.[14]  <u>Id.</u> (stating that the sale of stock "was

_____

[14]  Other Connecticut courts have found CUTPA applicable to claims arising from the stock sale of a business but have not considered <u>Russell</u>.  <u>See</u> <u>Fredericks v. Fortin</u>, No. CV89 0282910,

merely the means utilized to effectuate the sale" of that
business).[15]

Nevertheless, three of the Primus defendants – namely, the
Primus Venture Partners, Inc., Primus Venture Partners, and
Jonathan E. Dick – claim that dismissal is still warranted as to
them because the amended complaint contains no specific
allegations about their conduct.  The court disagrees.  These

---

1995 WL 599086, at *3 (Conn. Super. Oct. 2, 1995) (refusing to
dismiss a CUTPA claim alleging a sale of business by sale of
stock but not considering Russell); Maloney Indus., Inc. v.
Wayfarer Aviation, Inc., No. CV990365663S, 2002 WL 966248, at *2
(Conn. Super. Apr. 11, 2002) (assuming CUTPA could apply if the
defendant was in the business of selling businesses, but not
considering Russell).

[15]  The Primus defendants also rely on Gilman v. Gilman, No.
50 87 36, 1990 WL 283219, at *5 (Conn. Super. Aug. 29, 1990),
where shareholders claimed that the director and president
purchased shares in the corporation substantially below their
fair market value.  Attempting to circumvent Russell, the
shareholders argued that their shares were not governed by
federal or state statutes and that they were neither purchasers
nor sellers of securities.  Id. at *2.  After considering the
reasoning of Russell, other cases brought under the FTC act upon
which CUTPA is based, and the decisions of other jurisdictions,
the court held that CUTPA did not apply to allegations involving
a director's purchase of corporate stock.  Id. at 2-5.  The
Gilman court considered the distinguishing facts presented by the
shareholders but returned to the holding of Russell: "The claims
that arise out of the present suit arise out of the sale of stock
to the defendant."  Id. at *5.  While Gilman does indicate that
Russell precludes this claim, the court finds the reasoning of
Tie/Communications more congruent with the Connecticut Supreme
Court's later interpretation of Russell as precluding CUTPA in
claims involving regulated securities.  Moreover, the Connecticut
Supreme Court has interpreted Gilman as dismissing the CUTPA
claim "because the claimed injuries had been the result of
intracorporate actions," Fink v. Golenbock, 238 Conn. 183, 212
(Conn. 1996), a circumstance not present here.

-47-

defendants are discussed collectively throughout the amended complaint and were each involved in the Indication of Interest attached to the amended complaint. Thus, the amended complaint amounts to more than a blanket assertion of entitlement to relief. While Halo is required to plead specific factual allegations to make a claim plausible, see Twombly, --- U.S. ----, 127 S.Ct. at 1955, this does not require a heightened pleading standard of specifics. In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).

Accordingly, the court denies the 12(b)(6) motion to dismiss the CUTPA claims as to Primus defendants.[16]

## B. Aiding and Abetting the Breach of a Fiduciary Duty (Count 3)

The amended complaint also alleges that the Primus defendants aided and abetted Cooper's alleged breach of his fiduciary duty to Halo.[17] The Primus defendants argue that the

---

[16] The Primus defendants argue that, if the court dismisses the aiding and abetting claim, then it may dismiss the CUTPA claim because it is based on the same conduct. However, other than the argument discussed herein that Russell precludes liability, the court does not consider whether Halo has sufficiently stated a claim under CUTPA. The Primus defendants' footnote argument is not properly before the court. See, e.g., Rowley v. City of New York, No. 00 Civ. 1793(DAB), 2005 WL 2429514, at *6 (S.D.N.Y. Sept. 30, 2005) (refusing to consider an argument advanced in a footnote and citing cases).

[17] The amended complaint refers to this allegation as "tortious interference with fiduciary relations." (Am. Compl. [doc. # 63] at 24.) The more well-recognized name for this tort, which Halo uses in its reply papers, is "aiding and abetting a breach of a fiduciary duty." See Deer Creek Fabrics, Inc. v.

amended complaint fails to state a claim because it contains no allegations that they "substantially assisted" any breach. The court agrees that the claim must be dismissed.

To sustain a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege that: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." <u>Efthimiou v. Smith</u>, 268 Conn. 499, 505 (2004) (quoting <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983)); <u>accord</u> <u>Palmieri v. Lee</u>, No. 405641, 1999 WL 1126317, at *4 (Conn. Super. Nov. 24, 1999); <u>Stanley Ferber & Assoc. v. Northeast Bancorp., Inc.</u>, Nos. CV 93-0344932, CV 93-0344931, 1193 WL 489334, *5-6 (Conn. Super. Nov. 16, 1993).[18] The "substantial assistance" element requires

<hr>

Coyler, No. X05CV054002792S, 2007 WL 865697, at *3 (Conn. Super. Mar. 2, 2007) (stating that "the court could find no Connecticut appellate authority regarding" tortious interference with fiduciary relations).

[18] A Connecticut Superior Court, in <u>Deer Creek Fabrics, Inc.</u>, 2007 WL 865697, at *4, found that aiding and abetting a breach of fiduciary duty, which is considered synonymous with the tort of "tortious interference with fiduciary relations," has the following elements: "(1) that a fiduciary relationship exists, (2) that there was a breach of that duty, (3) that the third party knew of the fiduciary relationship, (4) that the third party intentionally facilitated, assisted in, or participated in the breach, (5) that the third party intended to cause harm to the plaintiff, and (6) that, in fact, the plaintiff suffered

plaintiffs to make some allegation "that the assistance provided by the alleged aider and abettor was a substantial factor in bringing about the violation." Brunette v. Bristol Sav. Bank, No. CV 92-0453957S, 1994 WL 468448, at *3 (Conn. Super. Aug. 22, 1994) (citing Mendelsohn v. Capital Underwriters, Inc., 490 F. Supp. 1069, 1084 (N.D. Cal. 1979)); accord In re Sharp Int'l Corp., 403 F.3d at 52 (stating that "substantial assistance" occurs in this context where a defendant "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur").

The amended complaint first alleges that "Cooper . . . together with Molner, acting on behalf of all Primus defendants in his capacity as managing partner, engaged in a telephone conversation with junior [New] Empagio management, [sic] instructed New Empagio employees in California not to invoice New Empagio customers." (Am. Compl. [doc. # 63] ¶ 52(a).) With respect to Northeast Utilities, the amended complaint alleges that "Cooper, together with Defendant Moln[e]r, again acting on behalf of all of the Primus defendants, emphatically disagreed with the anticipated arrangement with Northeast Utilities, [sic] forced the bid to be retracted." (Id. ¶ 52(b).) Other than

actual damages." Id. To the extent that Deer Creek's formulation of the tort does not require that the aider-abettor's assistance be substantial, the court finds that Halo must sufficiently allege substantial assistance to succeed on this claim. See, e.g., Efthimiou, 268 Conn. at 505.

-50-

saying that Molner acted "together with" Cooper, the amended complaint does not describe how Molner or any other Primus defendant assisted in cutting off Halo's cash flow.[19]

The Primus defendants argue that the allegations about Molner's participation in the phone conversation are insufficient to demonstrate substantial assistance. The court agrees. Molner's participation, no matter how extensive, in a phone conversation with Cooper could not have been a substantial factor in cutting off Halo's cash flow. At the time of the alleged phone conversation, Cooper was the CEO of New Empagio; there is no plausible inference that Molner could have substantially assisted a CEO in directing his own employees to take actions related to the company's customers. See Brunette, 1994 WL 468448, at *3 (requiring that any assistance was a "substantial factor" in bringing about the violation).

In addition to Molner's involvement in the phone conversation, the amended complaint also alleges that

_____

[19] The amended complaint also contains contradictory allegations that the Primus defendants did not participate in cutting off Halo's cash flow. For example, the amended complaint states that "[a]t some point specifically unknown to Plaintiff, [the Primus defendants] became aware that Cooper and his team were engaging in misconduct, at[]a minimum by taking steps to cut off Halo's cash flow for their own purposes." (Am. Compl. [doc. # 63] at 24, ¶ 67 (emphasis added); cf. id. ¶ 63 (alleging that the Primus defendants "directly participated in cutting off the cash flow to Halo").) Nevertheless, in reaching its decision, the court grants Halo every plausible inference from these allegations and does not consider any information outside the complaint, which might clarify these allegations.

"[n]otwithstanding their knowledge of the Cooper Group['s] misconduct, . . . [the] Primus [defendants] continued to render essential services to the Cooper group in the form of financial advice, due diligence, financial backing and participating in negotiations." (Am. Compl. [doc. # 63] at 24, ¶ 67.) In addition, the amended complaint alleges that the Primus defendants "waited until the very end of the exclusivity period to reduce their offer when they felt Halo was in no position to refuse." (Id. ¶ 63; see id. ¶¶ 67-68.)

Halo argues that the Primus defendants' continued participation in the transaction – after they knew of the alleged breach – supports liability. (See Pls.' Opp'n to Mot. to Dismiss [doc. # 66] at 12 ("Plaintiff is not claiming that mere participation in the acquisition of [New] Empagio is wrongful. Plaintiff is claiming that it became wrongful at such time as they became aware they were representing management who were engaged in serious misconduct.") (emphasis in original).) The Primus defendants argue that their continued participation in the transaction fails to constitute substantial assistance. The court agrees.

Under Connecticut law, a defendant's continued participation in a transaction cannot constitute substantial assistance. For example, in Stanley Ferber & Assocs. v. Northeast Bancorp., Inc., the court granted a lender's motion to strike an aiding and

abetting claim where "[t]he only 'substantial assistance' alleged is that [the lender] completed the merger transaction with [the fiduciary]." 1993 WL 489334, at *6 ("If the mere entering into the transaction were seen to constitute aiding and abetting a breach of fiduciary duty, then every arm's length offeror would be subject to liability for motivations on the other side of the transaction of which the offeror had neither control nor knowledge."); cf. Richard C. Mason, Civil Liability for Aiding and Abetting, 61 Bus. Law. 1135, 1154 (May 2006) ("[R]elatively few decisions have found affirmative assistance to exist where the affirmative acts of the defendant consist solely of providing financing."). Similarly, Halo's amended complaint alleges that the Primus defendants – by performing due diligence, providing financial advice, participating in negotiations, and continuing their financial support – merely took steps to complete the acquisition of New Empagio. Such actions cannot constitute substantial assistance under Connecticut law.

While liability can arise where the alleged aider and abettor owes the plaintiff some duty, Halo has not alleged that the Primus defendants owed any duty to Halo that would have required them to "blow the whistle" on Cooper's conduct or withdraw from the already-proposed transaction. Cf. Kaufman v. Cohen, 760 N.Y.S.2d 157, 170 (1st Dep't 2003) (stating that "the mere inaction of an alleged aider and abettor constitutes

substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff"); In re Sharp Int'l Corp., 403 F.3d 43, 49-53 (stating that "a company in a position to thwart or expose a breach of fiduciary duty may protect its interests by doing neither, sitting tight, and being quiet").  Absent such a duty, the Primus defendants' continued participation in the transaction cannot constitute substantial assistance.  See, e.g., Bayou Hedge Funds, 472 F. Supp. 2d at 534 (finding under Connecticut law that "a law firm does not incur any liability for failing to disclose to investors that its client was engaged in a Ponzi scheme if it had no fiduciary relationship with anyone except its own client"); Cumis Ins. Soc., Inc. v. Windsor Bank & Trust Co., 736 F. Supp. 1226, 1234-35 (D. Conn. 1990) (finding under Connecticut law that a bank was not liable for failing to disclose a check kiting scheme to another bank).

Accordingly, the court grants the Primus defendants' 12(b)(6) motion to dismiss Halo's aiding and abetting a breach of fiduciary duty claims against them.

## CONCLUSION

For the foregoing reasons, the court GRANTS Croft & Bender's motion to dismiss the amended complaint [doc. # 79]; GRANTS IN PART AND DENIES IN PART the Primus defendants' motion to dismiss the amended complaint [doc. # 76]; GRANTS Fraas's motion to dismiss the amended complaint, or in the alternative, to transfer

[doc. # 81]; DENIES AS MOOT Fraas's motion to transfer [doc. #85]; GRANTS Payne's motion to dismiss the amended complaint, or in the alternative, to transfer [doc. # 82]; DENIES AS MOOT Payne's motion to transfer [doc. #86]; DENIES Cooper's motion to dismiss, or in the alternative, to transfer [doc. # 78]; DENIES Cooper's motion to transfer [doc. # 84]; DENIES Garrett's motion to dismiss, or in the alternative, to transfer [doc. # 83]; and DENIES Garrett's motion to transfer [doc. # 87].[20]

SO ORDERED this 26th day of March, 2008 at Bridgeport, Connecticut.

_____ /s/ _____
Alan H. Nevas
United States District Judge

---

[20] Because Halo amended its complaint after the defendants filed their initial Rule 12 motions, the court finds the following motions are now MOOT: C&B's motion to dismiss for lack of jurisdiction [doc. #41] and amended motion to dismiss for lack of jurisdiction and failure to state a claim [doc. # 48]; the Primus defendants' motion to dismiss for lack of jurisdiction and failure to state a claim [doc. # 42]; Cooper's motion to dismiss for lack of jurisdiction [doc. # 44] and motion to transfer to another district [doc. # 51]; Fraas's motion to dismiss for lack of jurisdiction [doc. # 45] and motion to transfer to another district [doc. # 52]; Payne's motion to dismiss for lack of jurisdiction [doc. # 46] and motion to transfer to another district [doc. # 53]; and Garrett's motion to dismiss for lack of jurisdiction [doc. # 47] and motion to transfer to another district [doc. # 54].