```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT

HALO TECH HOLDINGS, INC.,        :
                                 :
       v.                        :    Civ. No. 3:07-CV-489(AHN)
                                 :
RANDALL COOPER,                  :
         ET AL.                  :
```

### RULING ON DEFENDANTS' MOTION TO DISMISS
### THE SECOND AMENDED COMPLAINT

The plaintiff, Halo Tech Holdings, Inc. ("Halo"), brings this action against an investment bank, venture capitalists, and the management team of its former wholly-owned subsidiary, alleging that they conspired to force Halo to sell its shares in the subsidiary at a discounted price.  Now pending before the court is a motion to dismiss the second amended complaint by the venture capitalists – Primus Venture Partners, Inc., Primus Capital Fund V LP, LLC, Primus Venture Partners V, LLC, Jonathan E. Dick, Phillip C. Molner, and Primus Venture Partners (collectively "the Primus defendants").  The Primus defendants claim that Halo lacks standing to bring the claims against them in the second amended complaint.  For the reasons given below, the court agrees and grants the Primus defendants' motion to dismiss.

### FACTS AND PROCEDURAL BACKGROUND

The court assumes the parties' familiarity with the facts and procedural history of this case and only relates those facts necessary to address the arguments raised by the Primus

defendants. In addition, because this is a motion to dismiss, the court construes the facts and all reasonable inferences therefrom in favor of the non-moving party, Halo.

Halo acquires, manages, and sells software companies. In 2006, Halo acquired all of the shares of Empagio, Inc. Thereafter, Halo combined Empagio, Inc. with two other companies it also had acquired, and formed a new company, also called Empagio, Inc. ("Empagio"). Halo became the sole shareholder of the new Empagio. In addition, Halo tapped the management team of Empagio, Inc., Randall Cooper ("Cooper"), Steven Payne, Steven Garrett ("Garrett"), and Lynne Fraas (collectively "the Cooper Group"), to manage the new Empagio.

In acquiring Empagio and the other two companies, Halo incurred debt of approximately $20 million. As a condition of the loan, Halo was required to make two payments in the first quarter of 2007, totaling $1.5 million. If Halo defaulted on either payment, the entire $20 million debt would be accelerated and fees and penalties would be imposed.

Shortly after forming Empagio in 2006, Halo considered selling the company. Halo anticipated that the sale price of the reconstituted company would cover the $20 million debt and also yield a substantial profit.

The Cooper Group did not want Empagio to be sold to a third party and instead wanted to purchase it for themselves. To that

end, they hired investment bankers, Croft & Bender ("C&B"), and secured financing through the Primus defendants.

At some point, all the defendants – the Cooper Group, C&B, and the Primus defendants – conspired to force Halo to sell Empagio for the cheapest price possible. In furtherance of that conspiracy, some or all of the defendants chased away potential buyers by telling them that Cooper had a right of first refusal to purchase Empagio, that Cooper intended to exercise that right, and that if Halo sold Empagio to anyone other than the Cooper Group, some of Empagio's clients would not renew their licensing agreements with the company.

In January 2007, after the defendants had succeeded in driving away other potential buyers, the Cooper Group sent Halo a "Letter of Intent," outlining a proposed agreement between the Cooper Group and Halo to purchase Empagio for up to $17 million, much less than Halo's anticipated sales price. The letter provided for a six-week period during which the defendants could conduct due diligence on Empagio and Halo had to refrained from negotiating with other buyers. The letter further indicated that the Primus defendants had agreed to finance most of the Cooper Group's purchase of Empagio.

Because of the lack of interest from other buyers in purchasing Empagio, Halo agreed to the terms of the Letter of Intent. Halo was not aware of the extent to which the defendants

had dissuaded other potential buyers.

Having induced Halo to enter into the Letter of Intent, the defendants took other actions to drive down the purchase price of Halo. In particular, because Halo derived all of its operating income from a "sweep" of excess cash from its subsidiaries' bank accounts, including Empagio, the Primus defendants and the Cooper group jointly planned and instructed lower-level employees of Empagio to delay invoicing certain Empagio clients, including Burlington Northern, and to change the payment terms of other clients, such as Northeast Utilities.

The intended and actual effect of this conduct was twofold. First, because the defendants delayed Empagio's receipt of revenues, Halo received less cash from its "sweep" of Empagio's accounts. By reducing the cash that Empagio could sweep from its account to Halo, the defendants intended to make it difficult for Halo to pay its lender so that Halo would be more inclined to accept an undervalued offer for Empagio. Second, because the negotiated purchase price in the Letter of Intent included an upward adjustment for the value of Empagio's accounts receivable, the defendants could reduce the purchase price of Empagio and divert the deferred revenues to themselves.

At the end of the exclusivity period, the defendants offered Halo $2.5 million less for Empagio than the amount stated in the Letter of Intent. Halo rejected that offer and sought other

buyers.  But as a result of the reduced cash flow it received from Empagio, Halo defaulted on the two payments required by its lender during the first quarter of 2007, and the lender accelerated the note and imposed penalties and fees.  Ultimately, because of increasing financial pressure from its lender, Halo sold Empagio for $16 million in May 2007 to another buyer.  Thereafter, Halo filed for bankruptcy.

Halo then brought this action, claiming: (1) unfair trade practices, in violation of Conn. Gen. Stat. §§ 42-110a et seq. ("CUTPA") against Cooper, Garrett, and the Primus defendants; (2) breach of fiduciary duty against Cooper and Garrett; and (3) civil conspiracy against Cooper, Garrett, and the Primus defendants.[1]

The Primus defendants now move to dismiss the second amended complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction on the ground that Halo lacks standing to bring these claims against them.[2]

---

[1] In the second amended complaint, Halo alleges that the other members of the Cooper Group and C&B were involved in the conspiracy, but Halo does not name them as defendants because the court previously granted their motions to dismiss the first amended complaint for lack of personal jurisdiction.

[2] The Primus defendants also move to dismiss Halo's CUTPA claim, but the court does not consider that argument because the court finds that the allegations in the second amended complaint do not support Halo's standing to bring either the CUTPA or the civil conspiracy claim.

STANDARD

"[S]tanding imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III.  This is the threshold question in every federal case, determining the power of the court to entertain the suit."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  In particular, the court's subject-matter jurisdiction for lack of standing "can be called into question either by challenging the sufficiency of the allegation or by challenging the accuracy of the jurisdictional facts alleged."  Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 68 (1987) (Scalia, J., concurring in part and concurring in the judgment) (emphasis omitted).  If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, as the Primus defendants do here, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff."[3]  Robinson v. Malaysia, 269 F.3d 133, 140 (2d Cir. 2001) (internal citations

---

[3] On a motion to dismiss pursuant to Rule 12(b)(1), where a defendant challenges the factual accuracy of the plaintiff's allegations, a district court may resolve disputed factual issues by reference to evidence outside the pleadings.  See, e.g., Goonewardena v. New York, 475 F. Supp. 2d 310 (S.D.N.Y. 2007).  However, because the Primus defendants only contest the sufficiency of Halo's allegations regarding standing, not their factual accuracy, the court need not look outside the second amended complaint and instead assumes for the purpose of this motion that Halo's allegations in the second amended complaint are true.

and quotation marks omitted).  Halo, as the one seeking relief, has the burden "to allege facts demonstrating that [it] is the proper party to invoke judicial resolution of the dispute." Thompson v. Cty. of Franklin, 15 F.3d 245, 249 (2d Cir. 1994).

DISCUSSION

The Primus defendants argue that Halo has asserted claims for injuries that are derivative of injuries suffered by Empagio, and therefore, under well-known rules of shareholder standing, Halo would have standing to bring a derivative action, that is, an action to recover damages on behalf of Empagio, but does not have standing to bring a direct action to recover on its own behalf.  Because Halo has brought this case as a direct action, the Primus defendants contend that Halo's claims should be dismissed for lack of standing.  Halo, however, argues that it suffered separate and distinct injuries apart from those suffered by Empagio and that its direct injuries give rise to individual standing.  The court agrees with the Primus defendants that Halo has not alleged a separate and distinct injury giving rise to direct standing to recover for the wrongs done to it individually.

A shareholder has standing to bring a derivative action against a third party to redress wrongs suffered by the corporation.  Smith v. Snyder, 267 Conn. 456, 461-462 (2004). Any recovery in a derivative action is returned to the

corporation, for the benefit of all shareholders.  Id. Generally, however, an individual shareholder "cannot pursue a [direct] cause of action [and recover individually] against third parties for wrongs or injuries to a corporation in which he or she holds stock, even if the stockholder suffers a harm that flows from the injury to the corporation, such as a reduction in the value of his or her stock."  Peterson v. Parillo, No. CV030477220S, 2005 WL 3663125, at *1 (Conn. Super. Dec. 8, 2005); accord Smith, 267 Conn. at 461-62 ("It is commonly understood that '[a] shareholder - even the sole shareholder - does not have standing to assert [direct] claims alleging wrongs to the corporation.'") quoting Jones v. Niagara Frontier Trans. Auth., 836 F.2d 731, 736 (2d Cir. 1987)).[4]

---

[4]  In determining standing, courts differ on whether to apply the law of the state in which the suit is brought or the law of the state of incorporation.  Compare, e.g., Kennedy v. Venrock Assoc., 348 F.3d 584, 589 (7th Cir. 2003) ("The question whether a suit is derivative by nature or may be brought by a shareholder in his own right is governed by the law of the state of incorporation."), with Morgan Howard (United States), LLC v. Lewis, 2006 WL 2348892, at *4 (Conn. Sup. Ct. 2006) ("Since Morgan Howard U.S. is a Delaware limited liability company, Delaware law would control as to defining or limiting defendant's rights as a shareholder or member of the company, but Connecticut law controls as to standing to maintain a lawsuit in this court.").  The parties assume that Connecticut law applies. While the second amended complaint does not indicate where Empagio is incorporated, the court knows from ruling on the first amended complaint that Empagio is incorporated in Delaware. Nevertheless, because the principles of shareholder standing are largely similar under Connecticut and Delaware law, the court nominally applies Connecticut law and looks to Delaware law to the extent it is instructive.  See, e.g., Morgan Howard (United States), LLC, 2006 WL 2348892, at *4 (stating that, even though

In some instances, however, a shareholder may have standing to bring a direct action and recover individually, not on behalf of the corporation. In order to have standing for a direct action, a shareholder must "sustain[] a loss separate and distinct from that of the corporation, or from that of other shareholders . . . ." Yanow v. Teal Indus., Inc., 179 Conn. 262, 282 (1979). In other words, the shareholder "must demonstrate that the duty breached was owed to the [shareholder] and that he or she can prevail without showing an injury to the corporation." Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004). If a shareholder cannot demonstrate a "separate and distinct" injury, then a shareholder does not have standing "to seek redress in a personal capacity for the wrong done to him individually." Yanow, 179 Conn. at 282.

Here, Halo seeks damages caused by the defendants' conspiracy to self-deal and mismanage Empagio in order to drive down the purchase price of Empagio. Halo's claimed injuries include lost revenue from Empagio because of the defendants' interference with Empagio's "business expectations" during the first quarter of 2007, "a loss of substantial opportunity to realize a profit in [Halo's] acquisition and subsequent sale of Empagio and its constituent companies," fees and penalties

---

Connecticut law determines a shareholder's standing to bring suit, "Delaware law is nonetheless instructive on the standing issue").

-9-

charged by Halo's lender after Halo defaulted on its debt, and the "enterprise value" of Halo, which filed for bankruptcy after it defaulted on its debt. (2d Am. Compl. ¶¶ 48, 64, 66-67.)

These injuries, however, all flow from the defendants' mismanagement of Empagio for their own benefit. For instance, when the defendants re-negotiated the payment terms with Empagio customers, Empagio received less revenue during the first quarter of 2007. With less revenue flowing into Empagio, there was less revenue to "sweep" to Halo. Thus, Halo's Empagio shares produced less revenue than Halo anticipated. As a result, Halo could not make the $1.5 million payments to its lender, and the lender accelerated the $20 million loan and imposed fees and penalties. Further, the defendants' mismanagement and self-dealing caused Halo to receive less revenue when it sold its shares of Empagio to a third party. This ultimately caused Halo to file for bankruptcy.

In short, the defendants' interference with Empagio's revenues set off a domino reaction – one injury causing another, and so on. But this does not mean that the defendants' self-dealing and mismanagement vis-à-vis Empagio directly injured Halo or, put another way, that Halo's injuries are separate and distinct from Empagio's injuries. See Smith, 267 Conn. at 461-462. Indeed, Halo could not prevail without also showing an injury to Empagio, a prerequisite to demonstrating a direct

injury.  See Tooley, 845 A.2d at 1039.  For this reason, Halo's injuries are derivative of Empagio's injuries, and as such, Halo would only have standing to bring a derivative action on behalf of Empagio.  Halo's injuries do not confer standing to bring a direct action to recover individually for harm that was indirectly caused by wrongs inflicted on Empagio, as it seeks to do here.  See, e.g., May v. Coffey, No. X10UWYCV065001410S, 2007 WL 1121748, at *6 (Conn. Super. Mar. 30, 2007) ("Generally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered their stock of less value, since the injury is generally not to the stockholder individually, but to the corporation – to the shareholders collectively."); accord Kramer v. Western Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988) ("Delaware courts have long recognized that actions charging mismanagement which depresses the value of stock allege a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action." (quotations and alterations omitted)).

Indeed, this situation is analogous to one the Second Circuit faced in In re Ionosphere Clubs, Inc. (Sobchack v. American Nat'l Bank & Trust Co.), 17 F.3d 600, 604-07 (2d Cir. 1994), where preferred shareholders alleged that a third party took actions that devalued the assets of a corporation to such an

extent that the corporation no longer had enough money to pay the preferred shareholders a dividend.  The Second Circuit held that the corporation's loss of assets, which resulted in the loss of the shareholders' dividend, "was not inflicted [on the shareholders] 'directly' or 'independently of the corporation.'"  Id.  Rather, the alleged depletion of assets was inflicted only on the corporation, and the nonpayment of the dividend suffered by the shareholders "occurred only as an indirect consequence of those wrongs against" the corporation.  Id. at 606-07.  Therefore, the Second Circuit concluded that the preferred shareholders' allegations did not give rise to a direct action because "the injury to the preferred shareholders' contractual rights to receive a dividend . . . was not inflicted directly or independently of the corporation but occurred as an indirect consequence of the diversion of assets from the corporation to other entities."  Id. at 606; see also Manson v. Stacescu, 11 F.3d 1127, 1131 (2d Cir. 1993) (holding that a fifty-percent shareholder lacked standing to pursue a direct action where the shareholder claimed that, by looting the company, the defendants violated their fiduciary duties to the shareholder because the shareholder did not sustain an injury that was separate and distinct from the injury sustained by the corporation.)

Halo's injuries are no different from the injuries suffered by the preferred shareholders in Ionosphere Clubs, Inc.  Like

-12-

those shareholders, Halo's claims are against third parties for self-dealing and the mismanagement of Empagio, which caused a decrease in Empagio's revenue and the value of its shares. And just as with those shareholders, Halo's injuries were "not inflicted directly or independently of [Empagio] but occurred as an indirect consequence of the diversion of assets from [Empagio] . . . ." Id. Therefore, like the preferred shareholders in Ionosphere, Halo lacks standing to bring a direct action against the third parties who allegedly injured the corporation Halo owned.

This is true even though Halo was the sole shareholder of Empagio and thus the only shareholder injured by the defendants' misconduct because Connecticut law does not make an exception to shareholder standing rules for closely-held corporations. For example, in Fink v. Golenbock, the Connecticut Supreme Court rejected the argument that any injury to a shareholder in a closely-held corporation would necessarily give rise to a direct action by the plaintiff-shareholder. 238 Conn. 183, 202-03 (1996). Indeed, the Connecticut Supreme Court has made it clear that shareholder standing rules apply even where a single shareholder holds all the shares. Smith, 267 Conn. at 461-62 ("It is commonly understood that a shareholder - even the sole shareholder - does not have standing to assert [direct] claims alleging wrongs to the corporation.") (alternations and internal

quotation marks omitted).

While Halo makes two arguments in support of standing, neither argument has merit.  First, Halo claims that it had a contract with the Cooper Group to receive the "swept" revenues, independent of its ownership of Empagio's shares, and thus has standing to recover for injuries caused by the Primus defendants' interference with that separate contract.  The court, however, cannot consider this claim because the second amended complaint does not allege the existence of any such separate contract between Halo and the Cooper Group regarding the "swept" revenues.  Moreover, the court cannot reasonably infer that Halo had a right to Empagio's revenues except through its ownership of Empagio's shares because it is a "fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons," <u>SFA Folio Collections, Inc. v. Bannon</u>, 217 Conn. 220, 232 (1991), and it is a general rule of corporate law that a shareholder does not have a right to the corporation's revenues until they are distributed by the corporation.  As the Connecticut Supreme Court has stated:

> It is well settled in this state that a corporation . . . own[s] the undivided earnings of the business, rather than the stockholders . . . [and] that the latter cannot become the separate owners of any part of the common property until set apart by the management for that purpose, by declaring a dividend or otherwise . . . .

<u>Spooner v. Phillips</u>, 24 A. 524, 526 (Conn. 1892).  Thus, the only

reasonable inference from the allegations in the second amended complaint is that Halo had no right to Empagio's revenues until they were set aside by Empagio to be "swept" to Halo as a dividend.

Second, Halo contends that it has standing to sue the Primus defendants, not because of its status as an Empagio shareholder, but because it had a contract to sell Empagio to the defendants. But Halo does not even allege the existence of any contractual relationship between it and the Primus defendants. Indeed, the second amended complaint alleges that Halo entered into the Letter of Intent with the Cooper Group, not the Primus defendants. And even so, the second amended complaint does not assert any claim that the Cooper Group breached that contract. To the contrary, the whole thrust of Halo's second amended complaint is that the Primus defendants conspired with the Cooper Group to breach the Cooper Group's fiduciary duties to Halo, the sole shareholder of Empagio. For example, Halo alleges that, in violating CUTPA, the defendants "entered into a conspiracy to wrongfully divert and impede Empagio's cash flow, misappropriate corporate opportunities and expectancies belonging to Empagio and Halo, and tortiously interfere with Empagio's contractual relationships with its client[s] to the detriment of Halo <u>as its sole shareholder</u>." (Am. Compl. ¶¶ 49 (emphasis added), 67 (alleging that the defendants "conspired to unlawfully and

tortiously interfere with Empagio's contractual relationships with its clients and Halo's lender, and to tortiously impede Halo's cash flow by interrupting Empagio's business operations in order to reduce Empagio's cash flow, <u>by engaging in fiduciary misconduct</u> . . .") (emphasis added).)  These allegations are based on Halo's status as an Empagio shareholder, not on any contract between the parties, and therefore, the court cannot find that Halo has standing to pursue claims against the Primus defendants based on a contract for the sale of Empagio.[5]

Accordingly, the court finds that Halo does not have standing to bring a direct action and recover individually against the Primus defendants.  While Halo may have been able to bring a derivative action on behalf of Empagio, it cannot do so now because it sold all its Empagio shares to a third party.  Once a shareholder disposes of his shares, he loses standing to bring a derivative action. <u>Guarnieri v. Guarnieri</u>, 104 Conn. App. 810, 821 (2007) ("No longer a shareholder in the corporation, the defendant cannot maintain a derivative action on its behalf.")  Therefore, Halo lacks standing to pursue the civil

---

[5] Halo also argued at oral argument that it has standing to bring claims against the Primus defendants, even though they were not in privity of contract with Halo, because they conspired with the Cooper Group to breach the Letter of Intent.  Given that this argument was raised for the first time at oral argument, was never briefed by the parties, and relies on allegations absent from the second amended complaint, the court does not consider it at this time.

conspiracy and CUTPA claims against the Primus defendants, and therefore, those claims must be dismissed.[6]

## CONCLUSION

For the foregoing reasons, the court GRANTS the motion to dismiss the second amended complaint [doc. # 117] by Primus Venture Partners, Inc., Primus Capital Fund LP, LLC, Primus Venture Partners V, LLC, Jonathan E. Dick, Phillip C. Molner, and Primus Venture Partners and DISMISSES the second amended complaint without prejudice.

SO ORDERED this 27th day of August, 2008 at Bridgeport, Connecticut.

/s/
Alan H. Nevas
United States District Judge

---

[6] While the Primus defendants ask the court to dismiss Halo's complaint with prejudice, the court declines to do so because Halo indicated at oral argument that it believes it can plead facts sufficient to establish standing. See Fed. R. Civ. P. 15(a) (providing that leave to amend a complaint "shall be freely given when justice so requires"); see also Porat v. Lincoln Towers Cmt'y Ass'n, 464 F.3d 274, 276 (2d Cir. 2006) (stating the "this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint . . .").