UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Halo Technology Holdings, Inc. f/k/a Warp Technology Holdings, Inc., and HTH Emp., et al.,<br>　　　Plaintiffs,<br><br>　　　v.<br><br>Randall Cooper, et al.,<br>　　　Defendants. | No. 3:07cv489(SRU) |

# RULING AND ORDER

　　　Halo Technology Holdings, Inc. ("Halo") and HTH Emp., Inc. ("New Empagio"), in their third amended complaint, allege that an investment bank, venture capitalists, and the management team of New Empagio conspired drive down the price of New Empagio, a then wholly-owned subsidiary of Halo. The venture capital defendants, Primus Capital Partners, Inc., f/k/a Primas venture Partners, Inc., Primus Capital Fund V Limited Partnership, Primus Venture Partners V, LLC, Jonathan Dick, Phillip Molner, and Primus Venture Partners (collectively the "Primus Group") have moved to dismiss the claims against it. For the following reasons, the Primus defendants' motion to dismiss (doc. # 147) is granted in part and denied in part.

I.　　　Standard of Review

　　　The Primus Group moved to dismiss the complaint both for lack of standing and for failure to state a claim. The party who seeks to exercise the jurisdiction of the court bears the burden of establishing the court's jurisdiction. *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994). To survive a motion brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a plaintiff must clearly allege facts demonstrating that the plaintiff is a proper party to seek judicial resolution of the dispute. *Id*. Although the plaintiff bears the ultimate

burden of establishing jurisdiction by a preponderance of the evidence, "until discovery takes place, a plaintiff is required only to make a prima facie showing by pleadings and affidavits that jurisdiction exists." *Koehler v. Bank of Bermuda*, 101 F.3d 863, 865 (2d Cir. 1996). "When considering a party's standing, we 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Thompson*, 15 F.3d at 249 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). If a plaintiff has failed to allege facts supportive of standing, it is within the court's discretion to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of standing. *Id*.

When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether the plaintiff has set forth a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007); *Iqbal v. Hasty*, 129 S. Ct. 1937 (2009); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "factual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action "with enough heft to show entitlement to relief . . . and enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *Iqbal,* 129 S. Ct. 1937, 50 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiffs to "provide the grounds of [their] entitlement to relief" through more than "labels and conclusions, [or] a formulaic recitation of the elements of [their] cause[s] of action," *Twombly*, 550 U.S. at 555. *Plausibility* at the pleading stage is

nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . 'recovery is very remote [or] unlikely.'" *Id*. at 556.

II.   Background

    A.   **Procedural History**

This case is over two years old, but has yet to proceed beyond the motion to dismiss stage. Judge Alan H. Nevas previously issued two rulings concerning the amended complaint (doc. # 63) and the second amended complaint (doc. # 107). In the amended complaint, Halo brought claims against the Primus Group for alleged unfair trade practices in violation of the Connecticut Unfair Trade Pracites Act ("CUTPA"), and tortious interference with fiduciary relations. The Primus Group moved to dismiss both claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court denied the motion with respect to the CUTPA claims against the Primus Group, but granted the motion with respect to Halo's aiding and abetting a breach of fiduciary duty. *See* Doc. # 101.

In its second amended complaint, Halo alleged that the Primus Group engaged in unfair trade practices in violation of CUTPA, and conspired with Cooper and Garrett. The Primus Group moved once again to dismiss the second amended complaint in its entirety pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that Halo lacked standing to pursue claims on behalf of New Empagio. The court granted the motion to dismiss in its entirety. *See* Doc. # 131. In a written ruling, Judge Nevas held that the allegations in the second amended complaint did not support Halo's standing to bring either a CUTPA or civil conspiracy claim against the Primus Group. The court reasoned that Halo, the sole shareholder of New

Empagio, could not allege injuries distinct from those of New Empagio. Halo, therefore, could only bring a derivative action, not a direct action against the Primus Group. To the extent that Halo could have filed a derivative action against the Primus Group, it lost that right when it sold all of its New Empagio shares to a third party. At oral argument, Halo represented that it could *still* allege facts to support a direct claim against the Primus Group. Accordingly, the court allowed Halo to amend its complaint.

On October 20, 2008, New Empagio filed a motion to intervene (doc. # 137). The third-amended complaint was filed jointly by New Empagio and Halo on January 29, 2009 (doc. # 143). I granted New Empagio's motion to intervene on May 7, 2009 (doc. # 153). In the third-amended complaint Halo renews its claims against the Primus Group alleging breach of contract and conspiracy in violation of CUTPA. New Empagio alleges for the first time that the Primus Group committed tortious interference and civil conspiracy in violation of CUTPA.

  **B.**  **Factual Background**

Taking all of the facts alleged in the third-amended complaint as true and drawing all reasonable inferences in favor of Halo and New Empagio, the following is a summary of the facts of this case. Halo Technology Holdings, Inc. is a Nevada corporation with its principal place of business in Stamford, Connecticut. New Empagio is a Delaware corporation with its principal place of business in Stamford, Connecticut. Currently, Halo and New Empagio are debtors-in-possession subject to the jurisdiction of the Bankruptcy Court of the District of Connecticut.

Cooper and Garrett are residents of Georgia. Cooper is a former employee of Halo. He served as the Chief Executive Officer of Halo's "human resources software and solution sphere."

Garrett is a former employee of New Empagio and served as its Senior Vice President of Resources and Development. Cooper and Garrett, together with other non-parties formed the Cooper Group. The Cooper Group managed the operations of New Empagio and owed a fiduciary duty of loyalty, disclosure and prohibition against self-dealing to Halo and New Empagio.

Primus Partners ("PP"), Primus Capital Fund Ltd. Partnership V, LLC ("PCF"), and Primus Venture Partners V, LLC ("PVP") are business organizations with their principal place of business in Cleveland, Ohio. PVP is the general partner of PCF. Jonathan Dick is a resident of Ohio and is the managing director of PVP. Phillip Molner, a resident of Ohio, is also listed as the managing director of PVP. All of the Primus Group entities are engaged in the private equity business. Plaintiffs assert jurisdiction based on both diversity and 28 U.S.C. § 1334 ("related" to bankruptcy actions.)

In 2005 and 2006, Halo acquired 100% of the issued and outstanding shares of three entities that later merged and formed New Empagio. At the time of the merger, the Cooper Group made up the majority of senior management at New Empagio. In early 2006, Halo and New Empagio became jointly and severally indebted to Fortress Financial Corporation, in the amount of $20 million. Under the terms of the agreement, Halo and New Empagio were required to make a principal payment in the amount of $500,000 on or before February 28, 2007 and another payment of $1 million on or before March 30, 2007. Default on those payment terms would result in an acceleration of the loan.

In the summer of 2006, Halo hired an investment firm to sell New Empagio. Halo anticipated the sales price of New Empagio to not be less than $30 million. Halo believed that

the sale of New Empagio at that price would enable it to pay off Fortress and improve its own balance sheet.  During the same time period, Cooper attended meetings on behalf of Halo to facilitate the sale of New Empagio.  The Cooper Group played a role in negotiating the sale of New Empagio.  The Cooper Group was also interested in purchasing New Empagio, and it used inside knowledge of Halo and New Empagio to undermine Halo's efforts to sell New Empagio so that the Cooper Group could purchase it themselves.

Cooper led potential buyers of New Empagio to believe that he had a right of first refusal, which led potential buyers not to submit bids for New Empagio.  Cooper also led potential buyers to believe that a purchase of New Empagio without retaining the Copper Group as senior management would prompt New Empagio customers to cease conducting business with New Empagio.  This also dissuaded potential buyers from purchasing New Empagio.

During the fall of 2006, the Cooper Group retained non-parties Croft & Bender ("C&B"), an investment banking firm, to assist the Cooper Group in negotiating the purchase of New Empagio from Halo.  C&B solicited the Primus Group as an equity financing source for the purchase of New Empagio.  The Primus Group, Cooper Group and C&B began negotiating with Halo to purchase New Empagio.  Under the terms of the proposed transaction, the Primus Group would have acquired a controlling interest in New Empagio and occupied controlling positions on the Board of Directors.  Because Halo had not yet received any offers for New Empagio, it negotiated with the Primus Group, the Cooper Group and C&B.  At that time, Halo was unaware that Cooper had interfered with prior potential buyers.  The Cooper Group issued a "Letter of Intent" ("LOI"), dated and signed by Halo on January 11, 2007, which set forth the terms governing the negotiations between Halo and the Cooper Group. (doc. # 143, Ex. B).  Per the

terms of the LOI, Halo and the Cooper Group agreed that:

    1. Halo would turn over confidential information concerning New Empagio for the purposes of due diligence.

    2. Information turned over under the agreement would be treated as confidential.

    3. Halo shall deal exclusively with C&B.

    4. Halo agreed to reimburse the parties, including the Primus defendants, their transaction expenses in the event that Halo breached the agreement.

Although not obvious from the face of the LOI, the Primus Group was the anticipated purchaser of New Empagio and the third-party beneficiary of the Halo/Cooper Group relationship.

The Primus Group, through Philip Molner, entered into a non-disclosure agreement with Halo in or around December 2006.  Under the terms of that agreement, Halo would allow the Primus Group access to confidential information about New Empagio in an effort to assist the Primus Group's financing of the Cooper Group's purchase of New Empagio.  The Primus Group, along with C&B undertook a review of New Empagio's finances, structure, business opportunities, and other confidential information.  Primus also negotiated the stock purchase agreement.  During the period of exclusivity the Primus Group, using confidential information about New Empagio, conspired with the other defendants to create a liquidity crisis for Halo and New Empagio.  The liquidity crisis forced New Empagio and Halo into a position where it was necessary to sell New Empagio at a reduced price.

The Primus Group encouraged the Cooper Group in the breach of its fiduciary duties to both Halo and New Empagio.  The Primus Group, using confidential information, participated in the interruption of New Empagio's business operations and cash flow.  In carrying out the scheme, the Primus Group, along with the Cooper Group, instructed lower level employees of

New Empagio to delay invoicing certain clients and altered the payment terms of other clients in order to reduce cash flow and drive down the value of New Empagio. At the end of the exclusivity period, the Cooper Group and the Primus Group told Halo that they had made a formulaic error and reduced purchase offer to $14.5 million. This offer coincided with the due date of the payment to Fortress and during a period when Halo could not negotiate with another party. Subsequently, Halo rejected the offer. Halo and New Empagio defaulted on the payments of $500,000 and $1,000,000. Fortress accelerated the loan and imposed penalties Halo and New Empagio.

On March 9, 2007, Halo entered into an agreement with Silver Oak to sell 90% of New Empagio's shares for $15 million. When Cooper learned of the agreement, he informed Halo that he would take steps to interfere with the sale. Indeed, Cooper told Silver Oak that if it purchased New Empagio, he and other New Empagio employees would leave the company. On March 12, 2007, Garrett notified Halo that he and New Empagio employees would not cooperate with due diligence efforts by Silver Oak. Silver Oak backed out of the deal. Cooper and Garrett were fired on March 12 and 14 respectively.

On May 25, 2007, New Empagio sold its assets for $16 million. Thirteen million of the purchase price paid at closing went directly to Fortress and the remaining balance on the Fortress loan was due before August 31, 2007. Halo and New Empagio filed for Chapter 11 Bankruptcy protection on August 20, 2007. Halo and New Empagio allege that defaulting on the loan was the proximate cause of New Empagio and Halo's bankruptcy filing.

III.     Discussion

Each of the counts brought against the Primus Group allege violations of CUTPA. In the

First Count of the complaint, Halo claims that it was in privity of contract with the Primus Group by virtue of the terms of the non-disclosure agreement and the Primus Group's status as an alleged third party beneficiary of the letter of intent.  Those contracts gave Primus access to otherwise confidential information for the sole purpose of evaluating the investment opportunity presented.  The Primus Group, Halo claims, intentionally breached the terms of the non-disclosure agreement by taking steps and actions constituting aggravating circumstances so substantial as to be immoral, oppressive, and unscrupulous in violation of CUTPA.  Additionally, Halo maintains that the Primus Group conspired with the other defendants to breach the non-disclosure agreement in violation of CUTPA.

The Second Count, also brought on behalf of Halo, alleges damages arising out of the conspiracy.  With respect to the Primus Group, Halo maintains that, in violation of CUTPA, the Primus group conspired with the Cooper Group to interfere with New Empagio's business, and in doing so, the Primus Group used confidential information in breach of the contract.  The Third Count is brought on behalf of New Empagio against all defendants.  New Empagio alleges that the Primus Group interfered with its fiduciary obligation to repay the Fortress loan, leading to New Empagio's eventual insolvency and bankruptcy and in violation of CUTPA.  The Fifth Count is also brought on behalf of New Empagio against all defendants, including the Primus Group alleging conspiracy.

All of the plaintiffs' claims arise out of alleged violations of CUTPA.  CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  A claim for a CUTPA violation can be brought by "any person who suffers any ascertainable loss of money

or property, real or personal, as a result of the use or employment of a method, act or practice prohibited." Conn. Gen. Stat. § 42-110g(a).  In Connecticut, when determining whether a practice violates CUTPA, the court evaluates "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]. . . . All three criteria are not necessary to support a finding of unfairness. 'A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . . or a practice amounting to a violation of public policy . . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA.'"  *Keller v. Beckenstein,* 117 Conn. App. 550, 565-66 (Conn. App. Ct. 2009) (*quoting H & L Chevrolet, Inc. v. Berkley Ins. Co.*, 110 Conn. App. 428, 441-42 (Conn. App. Ct. 2008)); *see also Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038 (2d Cir. 1995).

Halo's CUTPA claims are essentially claims of breach of contract, interference, and civil conspiracy.  New Empagio's CUTPA claims are based on interference and civil conspiracy.

**A.     Halo's Allegations**

       1.     *Breach of the Non-Disclosure Agreement*

Halo claims that the Primus Group intentionally breached the terms of the non-disclosure agreement by taking steps and actions constituting aggravating circumstances so substantial as to

-10-

be immoral, oppressive, and unscrupulous in violation of CUTPA, and (b) the Primus Group conspired with the other defendants to breach that contract in violation of CUTPA. In short, Halo charges the Primus Group with conspiring with the Cooper Group to breach the terms of the non-disclosure agreement and actually breaching the agreement by using confidential information about Halo's finances, obtained pursuant to the terms of the non-disclosure agreement, to conspire with the Cooper Group to drive down the price of New Empagio. The Primus Group argues that "there is no inferable causal connection between the alleged breaches of the non-disclosure agreement and the supposed harm suffered by Halo." Halo claims that any breach of the non-disclosure agreement, regardless of the harm suffered, is actionable.[1] Halo further contends that so long as it alleges an ascertainable loss, any CUTPA claim it raises should survive the motion to dismiss stage.

In Connecticut, a deceptive act that constitutes a breach of contract can form the basis for a CUTPA claim. A simple contract breach, however, does not constitute a violation of CUTPA. This is especially true "where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." *Boulevard Assocs.*, 72

---

[1] In its opposition to the motion to dismiss (doc. # 152), Halo raises for the first time a straight breach of contract claim against the Primus Group that is independent of any harm to New Empagio. This is a distinct claim from the one raised in the third amended complaint. In its complaint, Halo claims breach of contract only with respect to the effect the breach had on New Empagio's value. If Halo wished to bring a straight breach of the non-disclosure agreement claim against the Primus Group, it had ample opportunity to do so. Even if Halo had properly pled a straight breach of contract claim, it is difficult to imagine a scenario where Halo could succeed on a claim that the Primus Group breached the non-disclosure agreement by disclosing something to the Cooper Group – New Empagio's management team – that it did not already know.

F.3d at 1038-39; *see also Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.,* 41 Conn. Supp. 575, 580 (Conn. Super. Ct. 1991) ("A simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act. . . . "). For a breach of contract to constitute a CUTPA violation, there must be a breach plus a significant aggravating circumstance. *Boulevard Assocs.*, 72 F.3d at 1039.

The non-disclosure agreement is governed by the laws of the State of Delaware. Connecticut courts give "effect to an express choice of law by the parties to a contract provided that it was made in good faith." *Elgar v. Elgar,* 238 Conn. 839, 848 (1996). Accordingly, I apply Delaware law to the underlying breach of contract claim. With respect to the Halo's allegation that the breach of contract violates CUTPA, I apply Connecticut law. *See Country Club Assocs. v. Shaw's Supermarkets*, 643 F. Supp. 2d 243, 252 (D. Conn. 2009) ("The choice of law provision does not explicitly encompass tort claims.").

For Halo to succeed on a breach of contract claim in violation of CUPTA it needs first to show a breach of contract. In Delaware to maintain a claim for breach of contract, Halo must allege the existence of the contract, a breach of an obligation imposed by that contract, and damages. *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009). Halo specifically pleads breach of the implied covenant of good faith. Under the laws of Delaware, "to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Id.*

Assuming that Halo properly alleges a breach of contract claim – that the Primus Group

breached the non-disclosure agreement – it still must allege a significant aggravating factor to sustain a claim under CUTPA. Significant aggravating circumstances can be the refusal to perform under the contract while retaining the benefits, *Saturn Const. Co. Inc. v. Premier Roofing Co.,* 238 Conn. 293 (1996), modification under duress, *Lester v. Resort Camplands Int. Inc.,* 27 Conn. App. 59 (Conn. App. Ct. 1992), misrepresentations in formation, *Web Press Svcs. Corp. v. New London Motors, Inc.,* 203 Conn. 342 (1987), and egregious breach, *Carlyle Johnson Machine Co. v. April*, 2000 WL 234311 at *1 (Conn. Super. Ct. 2000). In *Carlyle Johnson*, the plaintiff and defendant had an agreement under which the defendant would assist plaintiff in developing an invention pursuant to the terms of a consulting agreement. The agreement contemplated that the plaintiff would own the patent. When the plaintiff fell behind in payments to the defendant, the defendant mislead the plaintiff and secretively secured a patent on the invention. The court found the conduct to be substantially aggravating, deceptive, unethical and unscrupulous in violation of CUTPA.

  Here, Halo fails to allege a "breach plus." It is apparent from facts in the complaint that any breach of the non-disclosure agreement could not rise to the level of substantially aggravating circumstances because the alleged disclosure was to other parties who already possessed the disclosed information concerning New Empagio's finances. Halo and PVP entered into a non-disclosure agreement in or around December 2006. Halo alleges that the Primus Group, by intentionally violating the terms of the non-disclosure agreement, utilized the information obtained in violation of the covenant of good faith and fair dealing by conspiring to force Halo to sell New Empagio. The agreement was signed in or around December 2006. In January 2007, Halo entered into a letter of intent with the Cooper Group. That letter of intent

gave the Cooper Group access to the same confidential information that the Primus Group was privy to under the agreement. Even if the Primus Group breached the non-disclosure agreement and provided the Cooper Group with confidential information about New Empagio's finances, the Cooper Group already had access to the information because (a) the Cooper Group was the management of New Empagio and (b) that information was subject to disclosure to the Cooper Group under the terms of the letter of intent.

With respect to the breach claim in general, Halo also fails to allege any direct damages. Even if Halo is correct and the Primus Group breached the non-disclosure agreement by providing the Cooper Group with confidential information about New Empagio's finances as part of a scheme to drive down the price of New Empagio, the damage inflicted was the reduced value of New Empagio. Indeed, Halo claims that the damage it suffered from the alleged breach was that it was forced to "sell New Empagio while under extreme pressure from its lender." The court has already dismissed Halo's claim for damages suffered by New Empagio (doc. # 131).

Halo does allege, as it must under CUTPA, that it sustained an ascertainable loss including "the loss of honest management for which Halo paid substantial salaries, loss of the benefit of its bargain to observe the terms of the non-disclosure agreement, [and that] the disclosure of confidential information to the Primus Group was used for dishonest and unscrupulous purpose." *See* Doc. # 143 at 22. Halo, however, fails to plead facts that support a claim for damages. A breach of the non-disclosure agreement cannot possibly be linked to the loss of honest management services; the Cooper Group already had access to anything the Primus Group was given access to for due diligence purposes. Also, the complaint alleges that the Cooper Group began undermining Halo's efforts to sell New Empagio as early as summer 2006.

The non-disclosure agreement did not take effect until December 2006.

At the motion to dismiss stage, the plaintiff must allege facts that form the basis of a plausible claim for relief. Halo alleges no fact that supports any inference that the Primus Group defendants actually breached the non-disclosure agreement. The complaint makes no mention of what the Primus Group disclosed. Nor does it state which section of the agreement was violated. Halo does not allege in the complaint, and could not state at oral argument, how the Primus Group used confidential information to cause Halo to breach its obligation to Fortress. Even assuming that a breach occurred, Halo fails to allege any independent harm. As discussed above, the previous rulings in this matter bar Halo from asserting a CUTPA claim based on its ability to repay Fortress if such a claim depends upon proving an injury to New Empagio.

Because the facts alleged in the complaint fail to support a claim that a breach of the non-disclosure agreement contributed in any way to an interference with the sale of New Empagio that harmed Halo, the Primus Group's motion to dismiss the First Count of the complaint is granted.

2.  *Breach of the Letter of Intent*

Halo also alleges in the First Count that the Primus Group was also bound by the Cooper Group letter of intent as a third-party beneficiary. The facts of the complaint fail to support the allegation. The letter of intent bound only the Cooper Group and Halo. The letter of intent is governed by the laws of Georgia and in Georgia a person who is not a party to a contract is not bound by its terms. *See Accurate Printers, Inc. v. Stark*, 671 S.E.2d 228 (Ga. Ct. App. 2008); *Levy v. Reiner*, 659 S.E.2d 848 (Ga. Ct. App. 2008).

None of the Primus Group defendants are included as part of the "Purchasing Group" or

"Buyer" under the terms of the letter of intent.  The Primus Group is only mentioned in section 2 of the letter, which addresses financing sources.  *See* Doc. # 143, ex. B.  The letter of intent does not create a binding relationship between Halo and the Primus Group.  Accordingly, Halo fails to state a claim for which relief could be granted with respect to a breach of the letter of intent.

### 3. *Civil Conspiracy and Tortious Interference*

In the Second Count, Halo alleges that the Primus Group conspired with the other defendants to interfere in New Empagio's business operations and breach the terms of the non-disclosure agreement for the Primus Group's own benefit.  The breach of the non-disclosure agreement has already been addressed.  In Connecticut, a claim of civil conspiracy is insufficient unless based on some underlying cause of action.  *Harp v. King*, 266 Conn. 747, 779 (2003).  Indeed, there is no independent claim for civil conspiracy under Connecticut law.  *Id*.  For Halo to recover damages on a civil conspiracy claim, it must allege facts necessary to satisfy the elements of an independent underlying cause of action.  If Halo fails to allege facts necessary to support an underlying claim, the cause of action for conspiracy must also fail.  *Id*.  Because Halo's breach of contract claim fails, any claim that the Primus Group conspired to breach the non-disclosure agreement must fail as well.

With respect to the portion of the Second Count that alleges interference with New Empagio's employees and cash flow, this is simply another attempt by Halo to recover for New Empagio's harm.  In Connecticut, to recover for tortious interference under CUTPA, the plaintiff must show: (1) a business relationship between the plaintiff and another party; (2) defendant's knowledge of that relationship; (3) defendant's intentional interference with the relationship; and (4) loss to the plaintiff.  *See Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 32-33 (2000).

Plaintiff must allege it suffered an actual loss. *Id.* at 33. "The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *See Macomber v. Travelers Property and Cas. Corp.* 277 Conn. 617, 635-36 (2006).

Halo maintains that the Primus Group interfered with New Empagio's business. To the extent that Halo had a relationship with New Empagio, it was that of sole shareholder. It is undisputed that the Primus Group was aware of the relationship between Halo and New Empagio, and a relationship between New Empagio and its customers. The complaint, however, fails to allege any facts to support a claim that the Primus Group intentionally interfered in the Halo-New Empagio relationship. The only harm alleged is harm directly to New Empagio and its relationships with its employees and customers. Because Halo fails to state a tortious interference claim on its own behalf for direct harm and losses, it necessarily fails to state a conspiracy claim. This is Halos' fourth attempt to plead a conspiracy claim against the Primus Group. The allegations in the complaint do not support this cause of action and even if the Primus Group conspired with the other defendants to drive down the price of New Empagio, the harm to Halo is indirect. Halo cannot bring a claim for indirect harm and, at this stage of the litigation, Halo cannot bring a shareholder action for recovery because it no longer owns shares of New Empagio. Accordingly, the Primus Group's motion to dismiss the Second Count is granted because Halo lacks standing to raise that claim.

### B.     New Empagio's Allegations

In October 2008, New Empagio filed a motion to intervene as an additional plaintiff (doc. # 137). In its motion, New Empagio alleges that its claims arise out of the same transaction or occurrence as Halo's claims. The Primus Group objected (doc. # 142), arguing that the motion fails because plaintiffs improperly filed their complaint. The motion to intervene was granted in May 2009 (doc. # 153), and I will not dismiss the claim on procedural grounds.

In the Third and Fifth Counts, New Empagio alleges tortious interference with its business activities and conspiracy to commit tortious interference. To survive a motion to dismiss the Third Count, New Empagio must show that it had a business relationship with another party, the Primus Group knew of that relationship, the Primus Group intentionally interfered with that relationship, and New Empagio suffered a resulting loss. *See Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. at 32-33.

Taking the facts in the complaint as true, New Empagio had a business relationship with its customers (specifically Burlington Northern and Northeast Utilities) and with its lender, Fortress. The Primus Group was aware of New Empagio's business relationship with its customers and lender. The Primus Group conspired with the Cooper Group to interfere in those relationships by delaying customer payments, instructing lower management to delay customer invoicing in order to induce a liquidity crisis, and taking steps to impede New Empagio's ability to repay Fortress. New Empagio's ascertainable loss is its eventual sale at a value less than it would have received but for the defendants' collective misconduct. Because New Empagio pleads facts that plausibly make out a claim for relief under CUTPA for tortious interference and conspiracy, the Primus Group's motion to dismiss the Third Count is denied.

With respect to the Fifth Count of the complaint, to establish a claim for civil conspiracy, New Empagio must show that the Primus Group, and at least one other party, conspired to engage in an unlawful act and at least one or more of the conspirators acted in furtherance of the scheme, resulting in damage to the plaintiff.  *See Macomber v. Travelers Property and Cas. Corp*., 277 Conn. at 635-36.  In order for New Empagio to properly plead a conspiracy claim it must allege conspiracy "plus."  *See Harp v. King*, 266 Conn. at 779.  Here, the plus is the tortious interference.  Because New Empagio alleges facts supporting its tortious interference claim, it must show that it also pleads facts supporting the elements of a civil conspiracy claim.

Taking all facts in the complaint as true, the Primus Group conspired with the Cooper Group to tortiously interfere in the sale of New Empagio.  The Cooper Group took steps to carry out the conspiracy by instructing lower level management to delay invoicing customers in an effort to create a liquidity crisis.  The Cooper Group also pressured Silver Oak into not purchasing New Empagio.  As a result of this and other conduct, New Empagio became insolvent and was forced to file bankruptcy.  New Empagio's claims as pled in the third amended complaint support a claim of civil conspiracy and, therefore, the Primus Group's motion to dismiss the Fifth Count is denied.

IV.     Conclusion

Halo lacks standing to bring a claim for harm inflicted upon New Empagio, and Halo fails to state a claim of civil conspiracy to breach the non-disclosure agreement and tortiously interfere with its business activities.  Accordingly, the Primus Group's motion to dismiss the First and Second Counts is granted.  New Empagio pleads facts that support its allegations of tortious interference and conspiracy to commit tortious interference with business activities.  Therefore,

the Primus Group's motion to dismiss the Third and Fifth Counts is denied.

    It is so ordered.

    Dated at Bridgeport, Connecticut, this 31st day of March 2010.

                                            /s/ Stefan R. Underhill
                                            Stefan R. Underhill
                                            United States District Judge